OPINION OF THE COURT
Bellacosa, J.
Plaintiffs, owners of several New York City rent-stabilized apartments at issue here, seek summary judgment to declare chapter 940 of the Laws of 1984 unconstitutional and related relief. That enactment requires the owners to offer renewal leases to defendant-respondent, Lenox Hill Hospital, a not-for-profit hospital enterprise on the Upper East Side of Manhattan, for apartments occupied by some of the hospital’s employees. Supreme Court and the Appellate Division upheld the validity of the statute and plaintiffs appeal as of right on constitutional grounds and a two-Justice dissent.
The precise issue for us to decide is whether chapter 940 of the Laws of 1984 substantially advances a legitimate State interest, justifying the State’s imposition of distinctive encumbrances and obligations on plaintiffs’ private property rights. The statute purports to justify and accomplish its objective through an amendment tied to the general purposes of the Rent Stabilization Law (RSL) and Emergency Tenant Protec *389 tian Act (ETPA). While these twin enactments coexist to remedy a persisting emergency housing shortage, the particular statute under review perpetuates a small, privileged housing stock. In terms, actuality, and functional impact, the statute does not protect and benefit specific occupant subtenants, but rather erects a subsidized housing regime for Lenox Hill Hospital’s preferential allotment.
We conclude that this legislation suffers a fatal defect by not substantially advancing a closely and legitimately connected State interest (see, Seawall Assocs. v City of New York, 74 NY2d 92, 107, cert denied sub nom. Wilkerson v Seawall Assocs., 493 US 976; Rent Stabilization Assn, v Higgins, 83 NY2d 156, 174, cert denied — US —, 114 S Ct 2693 [June 13, 1994]; see also, Nollan v California Coastal Commn., 483 US 825). Thus, we reverse the order of the Appellate Division.
L
This long-standing dispute cannot be understood or resolved without some historical background and context (see, 520 E. 81st St. Assocs. v Lenox Hill Hosp., 157 AD2d 138, revg 142 Misc 2d 723, revd on other grounds 77 NY2d 944). The rent stabilization system began in 1969 to ameliorate, over time, the intractable housing emergency in the City of New York. The housing shortage was ascribed to "continued high demand, attributable in part to new household formation and decreasing supply” (ETPA [L 1974, ch 574, § 4] § 2; see, Local Laws, 1969, No. 16 of City of New York § 1, now codified as Administrative Code of City of NY § 26-501). By regulating rents and providing occupants with statutory rights to tenancy renewals under rent stabilization — a "less onerous form of [rent] regulation” — the State intended to protect dwellers who could not compete in an overheated rental market, through no fault of their own (Sullivan v Brevard Assocs., 66 NY2d 489, 494; see, Braschi v Stahl Assocs. Co., 74 NY2d 201, 214 [concurring opn]). The regulation of this field has been maintained "to prevent uncertainty, hardship and dislocation,” and to "forestall profiteering, speculation and other disruptive practices” (see, e.g., Administrative Code § Y51-1.0 [renum § 26-401]).
Unlike rent control, which places stricter price controls on owners and leaves many dwellings only marginally profitable, the State, in enacting rent stabilization, seeks to insure more balanced terms under which owners may apply for regulated *390 rent increases and to protect primary occupants. Thus, in 1971, the Legislature exempted from rent stabilization regulation all housing accommodations not "occupied by the tenant in possession as his [or her] primary residence” (L 1971, ch 373). Similar language was incorporated into section 5 (a) (11) of the ETPA of 1974 (see, L 1974, ch 576, § 4). The phrase "tenant in possession” included both the tenant of record and any subtenant residing in the regulated apartment. In 1983, however, the Omnibus Housing Act (OHA) amended Rent Stabilization Law § YY51-3.0 (a) (1) (f) (now § 26-504 [a] [1] [f]) to exempt from the RSL dwelling units "not occupied by the tenant, not including subtenants or occupants, as his [or her] primary residence” (L 1983, ch 403, §41 [emphasis added]). Thus, under OHA, the named leaseholder had to occupy the apartment as a primary residence in order to qualify for a renewal lease. While the subletting of apartments was still permitted, Administrative Code § YY51-6.0 (c) (14) (now §26-511 [c] [12]) added that such tenants could not sublet units for more than a total of two years out of a four-year period, and only on the establishment of primary residency.
Next came chapter 940 of the Laws of 1984 (L 1984, ch 940, codified at Administrative Code of City of NY § YY51-3.0 [renum § 26-504]). It was enacted 13 months after the passage of chapter 403 and exclusively exalts the renewal rights of not-for-profit hospitals, which had formerly subleased rent-stabilized apartments to qualified hospital employees. Section 1 of chapter 940 amended the nonprimary RSL § YY51-3.0 (a) (1) (f) (renum § 26-504 [a] [1] [f]), providing "[w]here a housing accommodation is rented to a not-for-profit hospital for residential use, affiliated subtenants authorized to use such accommodations by such hospital shall be deemed to be tenants.” Thus, under chapter 940, subtenants of the primary tenant, a nonoccupying, not-for-profit hospital, were deemed qualified tenants in specific contradiction of the general purport of the 1983 OHA reforms. Chapter 940 further grants not-for-profit hospitals the right to sublet apartments to affiliated employees without first obtaining an owner’s consent and without requiring the hospital itself to maintain these apartments as a primary residence. Indeed, unlike any other regulated tenants, all of whom are authorized to sublet for only two out of every four years, the sublets by the not-for-profit hospital to its selected and variable employees is durationally unrestricted and open-ended. This is a unique and additional preference accorded no one else similarly situated. Moreover, *391 the hospital’s special privileges last for as long as its unilaterally controlled corporate existence.
The legislative history of chapter 940 reveals that Lenox Hill Hospital was the principal agent in urging the amendment (see, Senate Debates, NY Senate Bill S 9983, June 28, 1984 ["(t)his bill has been introduced at the request of Lenox Hill Hospital in New York City * * * (and i)ts purpose is to enable Lenox Hill to have the right to renewal leases”]). The salutary motivation was the preservation of safe, convenient, affordable housing for hospital staff (see, Letter from Lenox Hill Hospital, dated July 27, 1984, Bill Jacket, L 1984, ch 940, at 29). The primary and real beneficiary of this legislation, however, is Lenox Hill Hospital, not actual dwellers. The latter are only incidentally benefitted and may be evicted under the exclusive control or at the whim of their employer, Lenox Hill Hospital, to which the Legislature transferred significant, distinctive, apartment ownership prerogatives without its having to endure the burdens and costs of ownership.
The affected apartment owners sued, believing that chapter 940 could not constitutionally mandate that they provide Lenox Hill Hospital with these benefits under perpetual renewal leases. Supreme Court, in the phase of the litigation with which we are now dealing, dismissed the complaint. It held that chapter 940 did not constitute a physical taking since the owners had previously and voluntarily opened their premises to the hospital’s prime tenancy. Supreme Court also found no regulatory taking and concluded that chapter 940 advanced the principal goal of the RSL (154 Misc 2d 982). The Appellate Division (196 AD2d 728), with two Justices dissenting, affirmed for the reasons stated by Supreme Court.
IL
Elementary and strong constitutional principles protect private property rights and govern takings of property for public use without just compensation. They evolved " 'to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole’ ” (Penn Cent. Tramp. Co. v New York City, 438 US 104, 123, quoting Armstrong v United States, 364 US 40, 49; Seawall Assocs. v City of New York, 74 NY2d 92, 101, cert denied sub nom. Wilkerson v Seawall Assocs., 493 US 976, supra).
*392 While there is no "precise mathematical calculation” for determining when an adjustment of rights has reached the point when " 'fairness and justice’ ” requires that compensation be paid (Dolan v City of Tigard, 512 US —, —, —, 114 S Ct 2309, 2316, 2319 [June 24, 1994]), in Seawall Assocs. v City of New York (supra), this Court implemented the doubled-edged test for determining whether a regulatory taking has occurred. We held that a "burden-shifting regulation” will constitute a taking "(1) if it denies an owner economically viable use of his [or her] property, or (2) if it does not substantially advance legitimate State interests” (id., at 107, citing Nollan v California Coastal Commn., 483 US 825, 834, supra; see also, Agins v Tiburon, 447 US 255, 260). Failure to measure up to either criterion can invalidate a governmental incursion or encumbrance on private property rights (see, Seawall Assocs. v City of New York, supra; Lucas v South Carolina Coastal Council, 505 US —, —, 112 S Ct 2886, 2894; Nollan v California Coastal Commn., supra; Keystone Bituminous Coal Assn. v DeBenedictis, 480 US 470, 485, 495; Armstrong v United States, 364 US 40, supra). We are governed by this framework and discern no analytical basis or precedential authority to drop below this floor of constitutional protection for property owners or to alter well-established substantive and procedural rubrics and guidance in this complex field. In particular, we are satisfied that even if the economic impact aspect of this test (see, Hodel v Irving, 481 US 704, 714) were not to be satisfied, that feature alone could not defeat the owners’ interests and claims in a controversy such as this, without consideration and fulfillment of the substantial State interest and close causal nexus prong of the governing test, even as to regulatory takings.
This Court also recently expressed the view that the substantial State purpose for such legislation must be bound by a "close causal nexus” to survive scrutiny (see, Rent Stabilization Assn. v Higgins, 83 NY2d 156, 174, cert denied — US —, 114 S Ct 2693 [June 13, 1994], supra; see also, Dolan v City of Tigard, 512 US —, 114 S Ct 2309, supra). The precedents, State and Federal, thus establish a constitutional minimum floor of protection which this Court lacks authority to diminish under the Supremacy Clause (see, Kaye, Dual Constitutionalism in Practice and Principle, February 1987 Cardozo Lecture, reprinted in 42 Record of Assn of Bar of City of NY 285, 289, 293, 294; see also, Brennan, The Bill of Rights and the States: The Revival of State Constitutions as Guardians of *393 Individual Rights, 61 NYU L Rev 535, 550 [1986] [the Federal Bill of Rights creates "a federal floor of protection”]).
While the typical taking occurs when the government acts to physically intrude upon private property, governmental regulations which limit owners’ rights to possess, use or dispose of property may also amount to a "taking” of the affected property (see, cg., Agins v Tiburon, 447 US 255, supra; Nectow v Cambridge, 277 US 183, 188; Seawall Assocs. v City of New York, 74 NY2d 92,101, cert denied sub nom. Wilkerson v Seawall Assocs., 493 US 976, supra). We held in Seawall that the challenged local law effected a regulatory taking and was unconstitutional because the burdens imposed on owners did not substantially advance the stated public aim of alleviating homelessness. The combined effect on the instant case of these principles gains inexorable momentum from the twin temples of the Supremacy Clause flowing from pertinent United States Supreme Court precedents and the stare decisis import of our own decisions.
The differing views of the members of the Court in this case derive principally from varying interpretations of governing precedents. As to Judge Ciparick’s dissenting opinion, the difference is essentially one of application, but as to Judge Levine’s, it is a profound difference from the majority as to the understanding and interpretation of what the many governing precedents say and mean. Judge Levine’s dissent discounts Seawall and casts unfortunate uncertainty on the governing precedents and principles, while the majority is more confident as to the meaning and application of the governing law (compare, Simpson v Loehmann, 21 NY2d 305, 314 [Breitel, J., concurring opn]).
For example, there is no basis in Nollan itself for concluding that the Supreme Court decided to apply different takings tests, dependent on whether the takings were purely regulatory or physical. The Court promulgated a principle for all property and land-use regulation matters. A crucial threshold of analysis is that no taking occurs if a law " 'substantially advance[s] legitimate state interests’ ” (Nollan, supra, at 834). In discussing the lack of a standard for determining what constitutes a "legitimate state interest,” the Supreme Court specifically referred to nonphysical regulatory takings cases (see, Nollan, supra, citing Agins v Tiburon, 447 US 255, supra; and Penn Cent. Transp. Co. v New York City, 438 US 104, supra). Further, the Supreme Court refrained from placing *394 any limitations or distinctions or classifications on the application of the "essential nexus” test. This suggests and supports a uniform, clear and reasonably definitive standard of review in takings cases (see generally, Peterson, Land Use Regulatory "Takings” Revisited: The New Supreme Court Approaches, 39 Hastings LJ 335, 351). Indeed, Justice Brennan, in dissent in Nollan, expressly attributed to the majority’s holding in Nollan an impact on all regulatory takings cases, stating that the Court’s "exactitude * * * is inconsistent with our standard for reviewing the rationality of a State’s exercise of its police power for the welfare of its citizens” (Nollan, supra, at 842-843).
We conclude that chapter 940 fails the test of substantially advancing a legitimate State interest warranting the indeterminate and unjustifiable burden draped disproportionately on the particular owners’ shoulders. That law, in the unusual development and circumstances of this case, must meet the constitutional safeguards on its own merits, not as an augmentation or complement to some generalized State interest found elsewhere in organic law or other statutes. Indeed, in significant respects, the particular statute contradicts two key goals of the RSL, to wit, occupant protection and eventual market redemption. These incongruities flow out of the transferral of power from a landlord to the employer of the actual occupants, and by the removal of the affected apartments entirely and permanently from marketplace availability or potentiality for other publicly interested or vying occupants at rent-stabilized rates.
The preservation of this Manhattan Upper East Side housing enclave for this privileged entity’s benefit, albeit one engaged in a laudable and necessary eleemosynary health service function, cannot masquerade as general welfare legislation. Purporting to promote the general public welfare by enabling not-for-profit hospitals to continue to provide subsidized housing benefits to its chosen employees cannot sustain the sweep and manner of the burden and confiscation effected against the few owners. Dissenting Justice Joseph P. Sullivan aptly framed the consequences as follows:
"A statutory interpretation which encourages the deployment of rent stabilized apartments in perpetuity as temporary dormitory space for an ever changing roster of hospital employees and promotes the displacement of these employees, some *395 of whom may be long-term tenants, when they leave their employment does a disservice to rent stabilization’s underlying purpose of protecting residential tenants from evictions during an acute housing shortage” (196 AD2d 728, 732, supra).
Lenox Hill Hospital, the State and our colleagues, Judges Levine and Ciparick, in their discrete dissenting opinions, urge that the requisite State interest is satisfied under the over-all umbrella of the RSL and for the general health and welfare. We respectfully disagree. Judge Ciparick’s dissenting opinion, in our view, does not give the holdings of the governing cases sufficient weight and import affecting the rationale and application we have advanced in the instant case. Judge Levine’s approach, on the other hand, would seem to undermine Seawall or, sub silentio, place its precedential force in considerable doubt. Functionally, his analysis undercuts the legitimate State interest and close causal connection components of the well-established test. Moreover, the majority has not, as Judge Levine asserts, adopted some variable of the standard governing tests or effected per se rules, applications or consequences (Levine, J., dissenting opn, at 407).
The Supreme Court and this Court in the cited cases have ruled definitively in the fulfillment and exercise of an appropriate and necessary judicial review function, providing governing guidance for future cases, including this one. This traditional, fundamental, judicial role is not inimical to the prerogatives of the other branches, but serves instead as the singular check and balance against governmental intrusion and overreaching (Ciparick, J., dissenting opn, at 420). We, thus, resolve the controversy between the property owners and their prime tenant, Lenox Hill Hospital, and thus settle the juridical relationship and rights as between them. The power equation should, therefore, not be characterized as between so-called greedy owners and needy dwellers. Rather, this case is about a one-dimensional financial award, subsidizing an employer which happens to be a nonoccupying prime tenant and which wishes to avoid the concomitant burdens and responsibilities of ownership. Whatever consequences flow from our ruling, then, are the product of the law itself and its proper adjudication, not a societal or policy preference of our making.
The central, underlying purpose of the RSL is to ameliorate the dislocations and risk of widespread lack of suitable dwell *396 ings. Chapter 940 does not contribute to that desirable altruistic aim. It affects a tiny number of dwelling units. The effect of the statute is also quite ephemeral. These apartments were subject to rent stabilization prior to the enactment and will remain so, irrespective of the outcome of this long-standing dispute affecting a dwindling number of apartments, still in controversy in this litigation, with respect to the hospital’s prime tenancy lease renewal entitlements. Accordingly, chapter 940 fails to substantially or functionally prevent or relate to excessive rents and profiteering.
The realistic appraisal of chapter 940 shows that it was sought and designed essentially to subsidize the nonprofit hospital’s special fringe benefit to some of its special health care employees. This common employer-employee dilemma has no legally or legitimately cognizable, causal relationship to the governmental intrusion on rights and entitlements due owners in the use and enjoyment of their properties in a rental market where demand intractably exceeds supply at affordable levels. Chapter 940 is really interposed as a special housing program, privately funded through those owners who happen to have previously rented to not-for-profit hospitals, like Lenox Hill Hospital.
The real goal of Lenox Hill and other arguably similarly situated not-for-profit hospitals is preserving a valuable perk for some of its health care workers. This has little to do with a general State housing concern warranting chapter 940’s intervention. Rather, it sharply contradicts that indispensable legislative threshold and constitutional prerequisite. The fact that the State has acted through the "landlord-tenant relationship does not magically transform general public welfare, which must be supported by all the public, into mere 'economic regulation,’ which can disproportionally burden particular individuals” (Pennell v San Jose, 485 US 1, 22; see also, Penn Cent. Transp. Co. v New York City, 438 US 104, 124, supra).
in.
The exception created by this challenged enactment to the primary, occupying tenancy entitlement is infirm for additional reasons. A proffered State interest, which by definition should serve and protect the general populace on a fairly and uniformly applied basis, should not be countenanced when, as occurs here, the statute instead benefits one special class for *397 an essentially unrelated economic redistribution and societal relationship (see, 19th St. Assocs. v State of New York, 79 NY2d 434). Moreover, the employer here is transformed into the de facto landlord and receives a benefit directly related to conserving its capital or operating expenditures. As a health care provider, it would otherwise have to recoup those costs by direct expense reimbursement formulas or charges, like others similarly situated, for the true, full cost of medical services rendered in its community. This statute thus diverts and subverts that equal treatment regime. It does not even really protect housing for the subtenant-employees as such, and certainly provides no benefit to the citizenry at large on a fair opportunity and equal access basis. Rather, it bestows a State-enacted indirect gift to a preferred supplicant, the nonoccupying prime tenant, underwritten by the improperly burdened property owners. In this respect, chapter 940 cannot escape the force of 19th St. Assocs. v State of New York (79 NY2d 434, supra), a potent precedent like several others (see, e.g., Seawall, Higgins, Nollan, Agins), not fully appreciated as to their full import and impact in both dissenting expressions.
Part of the underpinning of the hospital’s and State’s claim in this case rests on a belated assertion of a health care crisis in the City of New York. The Legislature declared no such crisis in enacting this privileged exception. Also, such a generalization would precedentially countenance a myriad of favoritism experiments or supplicant demands or preferential entitlements to special classes of entities over the wider, appropriate and constitutionally authorized and recognized State interests of the general public.
We conclude that the peripheral and generalized State interests offered as justification for the regulatory mandates of chapter 940 fail to sustain the legislation, as constitutionally required for such State action. They are not closely or legitimately connected to the long-established and recognized goals of the RSL and ETPA, which seek to ameliorate the emergency housing shortage. The regime of this statute, in significant functional respects, contradicts an essential tenet of housing protection, at the root of rent-controlled and rent-stabilized enactments. An overarching goal of the RSL and ETPA is to afford some measure of security to occupants so they do not lose their scarce dwelling space due to unilateral, oppressive activities from more powerful entities in the societal equation, whether they be landlords or employers or both. The insupportable contradiction in this statute is cogently *398 demonstrated by its unabashed transfer to the corporate employer of greater eviction rights over its affiliated and disaffiliated employee subtenants than the owner is allowed to retain.
IV.
Appellants owners also claim that chapter 940 results in a regulatory wresting away of their reversionary property interests. Property attributes to any physical object include the rights "to possess, use and dispose” of the asset (United States v General Motors Corp., 323 US 373, 378). It is well established that even if only a single element of an owner’s " 'bundle of [property] rights’ ” is extinguished, there has been a regulatory taking (see, Hodel v Irving, 481 US 704, 716, supra; see also, Seawall Assocs. v City of New York, 74 NY2d 92, supra). Application of the Seawall analysis in that respect to the present case adds further support to our primary analysis and result that an unconstitutional taking occurs here under chapter 940 (see, Hodel v Irving, 481 US 704, supra; Koenig v Jewish Child Care Assn., 67 NY2d 955; Rent Stabilization Assn, v Higgins, 83 NY2d 156, 176, supra) — though we need not decide this issue on a stand-alone basis because we do not consider it dispositive by itself in this case. We respectfully submit that Judge Levine’s dissenting opinion also misperceives and mischaracterizes the majority’s analysis and holding in the reversionary interest aspect of this case.
Because Lenox Hill Hospital has enjoyed a corporate existence since 1917, the enactment also confers a tenancy quite different in kind, degree and potential from the human, personal successorships countenanced in Braschi v Stahl Assocs. Co. (74 NY2d 201, 214, supra) and Rent Stabilization Assn, v Higgins (83 NY2d 156, supra; cf., Sullivan v Brevard Assocs., 66 NY2d 489, supra). These cited successorships were narrowly recognized and permitted precisely because of the analytic-policy underpinning of averting personal evictions of real people. They are consistent with the antieviction goals of the ETPA and RSL. This statute is not. Yet, both dissents ignore the critical distinction.
We next turn to Yee v Escondido (503 US 519), which does not compel a different result, despite Judge Levine’s extensive reliance. Yee was a "physical occupation” takings case, not a regulatory type. More importantly, Yee dealt with an entirely different statutory scheme. In Yee, a group of mobile *399 home park owners brought an action claiming that a local rent control ordinance, which applied to all mobile home parks in the municipality, constituted a physical taking because the local ordinance deprived the petitioners of all use and occupancy of their real property. Yee is additionally distinguishable because the local law was general, not a targeted, narrow, special interest as with chapter 940, and there was no allegation or proof submitted by the park owners that the local ordinance placed an inordinate burden on selected individuals which, " 'in all fairness and justice, should be borne by the public as a whole’ ” (Penn Cent. Transp. Co. v New York City, 438 US 104, 123, supra). Moreover, although the Supreme Court refused to address the petitioners’ regulatory taking claim, citing a Supreme Court rule 14.1 (a) violation, the Court stated that the regulatory claim did "not depend on the extent to which petitioners are deprived of the economic use of their particular pieces of property” (Yee v Escondido, 503 US, at 534, supra). Thus, Yee is more analogous to a constitutional challenge against the legislatively created rent control and rent stabilization as a whole, which we certainly do not have in this case and by no means does our ruling affect or diminish the general validity of those broad, long-standing protections and enactments.
Lenox Hill Hospital also urges that chapter 940 assures an "economically viable rate of return” on the subject apartments to owners, since the statute provides for a 15% vacancy surcharge if there has been no vacancy rental increase within the prior seven years. The sweep of chapter 940, however, goes well beyond that tendered balance wheel (compare, Concrete Pipe & Prods, v Construction Laborers Pension Trust, 508 US —, —, 113 S Ct 2264, 2291). The statute vests renewal rights in an entity of unlimited existence, a notion directly contrary to another goal of the RSL and ETPA — to free up apartments, fairly and appropriately, as soon as practicable (see, Rent Stabilization Assn, v Higgins, 83 NY2d 156, 176-177, supra; Koenig v Jewish Child Care Assn., 67 NY2d 955, 958, supra). Lastly in this connection, the Court appears to be unanimous in rejecting Lenox Hill’s assertion that plaintiffs are estopped from contesting the constitutionality of chapter 940.
The sharply focused legal question under the controlling precedential and analytical principles may be reduced simply to whether the legislation is supported by a substantial State interest and close nexus. No amount of extensive and virtually *400 exclusive exploration of economic recalibration of the test, as an expectation for the future, can change that central controlling feature under reasonably clear precedents and principles. To take State action as with the challenged statute, the State must show a legitimate, substantial State interest that is closely, causally related to the action undertaken. The Constitution forbids State action by fiat, no matter the economic equation. Thus, by exercising the judiciary’s constitutional duty to decide this case within appropriate precedential and judicial review templates, this Court concludes that the generalized presumption of constitutionality accorded to statutes cannot substitute for the fundamental defect in chapter 940, to wit, no substantial advancement of a legitimate State interest and "close causal nexus” required for the challenged regulatory enactment to survive scrutiny (see, Rent Stabilization Assn. v Higgins, 83 NY2d 156, 173-174, supra).
Accordingly, the order of the Appellate Division should be reversed, with costs, and chapter 940 of the Laws of 1984 declared unconstitutional and the case should be remitted to Supreme Court, New York County, for such further proceedings as may be necessary and appropriate to resolve rights and remedies among the parties to this litigation affected by the holding of this case.