45 F.3d 665
 63 USLW 2463
 RESOLUTION TRUST CORPORATION, as Receiver for Nassau Savings
and Loan Association, F.A., Plaintiff-Appellant,
v.
Selma DIAMOND, Ira Kaufman, Jerome Lederer, Peggy Lehman,
Susan Solomon Patullo, Lloyd Ribner, as executor of the
estate of Muriel Ribner, Horace Solomon, Lillian Solomon,
Denise Tucker, Angelo Aponte, Commissioner of the Division
of Housing and Community Renewal of the State of New York,
and Robert Abrams, Attorney General of the State of New
York, Defendants-Appellees,
and
New York State Division of Housing and Community Renewal, Appellee.
 No. 55, Docket 92-6244.
 United States Court of Appeals,
Second Circuit.
 Submitted Nov. 23, 1994.
Decided Jan. 20, 1995.
 
 Dennis S. Klein, Washington, DC (Hughes Hubbard & Reed, of counsel), for plaintiff-appellant Resolution Trust Corp.
 Carter G. Phillips, Washington, DC (Richard D. Bernstein, Peter D. Keisler, Sidley & Austin, on the brief), for defendants-appellees Lillian Solomon, Horace Solomon, Ira Kaufman, Peggy Lehman, and Denise Tucker-Kellen.
 G. Oliver Koppell, Atty. Gen. State of N.Y. (Gary R. Connor, Karen S. Smith, Asst. Attys. Gen., on the brief), for defendants-appellees G. Oliver Koppell, Atty. Gen., Donald Halperin, Com'r of Div. of Housing and Community Renewal, and Selma Diamond, and for appellee Div. of Housing and Community Renewal.
 Don D. Buchwald, New York City, for defendant appellee Susan Solomon Patullo.
 Colleen F. McGuire, New York City, for defendant-appellee Lloyd Ribner, as Executor of the Estate of Muriel Ribner, deceased.
 Before: PRATT, McLAUGHLIN and JACOBS, Circuit Judges.
 JACOBS, Circuit Judge:
 
 
 1
 This matter returns to us following a remand by the Supreme Court. See Solomon v. Resolution Trust Corp., --- U.S. ----, 115 S.Ct. 43, 130 L.Ed.2d 5 (1994). Our previous decision reversed an order granting summary judgment in favor of the tenants and the state, and remanded to the district court with instructions to enter judgment for the Resolution Trust Corporation ("RTC"). Resolution Trust Corp. v. Diamond, 18 F.3d 111 (2d Cir.1994).[1] The Supreme Court vacated that decision, and remanded for reconsideration in light of its decision in O'Melveny & Myers v. FDIC, --- U.S. ----, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), an opinion issued several months after our opinion in Diamond.
 
 
 2
 Having carefully considered O'Melveny, as well as the briefs contesting its proper impact on Diamond, we now reinstate our previous decision, with one modification affecting the remaining lease term of rent controlled tenancies, and we remand with instructions that the district court enter judgment for the RTC in accordance with this opinion and the reinstated opinion.
 
 Background
 
 3
 A. The Facts.
 
 
 4
 A full statement of the facts is in our previous decision. We presume familiarity with that opinion, and recount here only the few facts that bear upon the impact of the Supreme Court's decision in O'Melveny.
 
 
 5
 The individual tenant-defendants occupy rent-regulated condominium apartments in New York City that are now owned by the RTC--as receiver for the failed Nassau Savings and Loan Association, F.A. In late 1990 and early 1991, the RTC repudiated the leasehold interests of the tenants pursuant to authority granted by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). See 12 U.S.C. Sec. 1821(e)(1). After encountering resistance from the tenants and New York's Attorney General, the RTC filed a complaint in the United States District Court for the Southern District of New York, asking for (inter alia ) a declaration that the RTC possessed the repudiation power that it had exercised. New York countered with a separate lawsuit that was consolidated with the RTC's case. After briefing by the parties, the district court concluded that these tenancies were "statutory tenancies" rather than traditional leaseholds and that the RTC therefore lacked the power under FIRREA to repudiate them. The district court accordingly entered summary judgment in favor of New York and the tenants.
 
 
 6
 We reversed the district court's decision, vacated the grant of summary judgment to New York and the tenants, and ordered that judgment be entered for the RTC. In so doing, we held that the tenancies at issue--albeit "statutory tenancies" according to state law--were nevertheless rooted in lease or contract, and were therefore subject to the RTC's repudiation power. Diamond, 18 F.3d at 121. Under FIRREA, after RTC repudiation, the tenant may choose to "remain in possession of the leasehold interest for the balance of the term of the lease...." 12 U.S.C. Sec. 1821(e)(5)(A)(ii). In deciding the remaining term of these rent-regulated tenancies, we looked to state law, and concluded that rent-stabilized tenants could remain until the expiration of their current lease, and rent-controlled tenants could remain until expiration of a two-year period "commencing on the January 1 of the last biennial review set by the statute prior to notice of repudiation." 18 F.3d at 124. New York and the tenants filed a petition for a writ of certiorari. In Solomon v. Resolution Trust Corp., --- U.S. ----, 115 S.Ct. 43, 130 L.Ed.2d 5 (1994), the Supreme Court remanded this matter to us for reconsideration in light of O'Melveny.
 
 
 7
 B. The O'Melveny decision.
 
 
 8
 O'Melveny involved a suit brought in 1989 by the FDIC, acting as receiver for a failed savings and loan ("S & L"), against the law firm that had represented the S & L in two 1985 real estate syndications. The FDIC asserted state-law tort claims of professional negligence and breach of fiduciary duty. The defendant law firm, O'Melveny & Myers, successfully moved for summary judgment on the grounds (1) that it owed no duty to the bank or its affiliates to uncover the S & L's own fraud; (2) that knowledge of misconduct by S & L officers is imputed to the S & L, and therefore to a receiver that stands in its shoes; and (3) that the FDIC was estopped by that imputed knowledge from pursuing its tort claims against the law firm. O'Melveny, --- U.S. at ----, 114 S.Ct. at 2052. The Ninth Circuit reversed the district court's grant of summary judgment in favor of the law firm. FDIC v. O'Melveny & Meyers, 969 F.2d 744 (9th Cir.1992).
 
 
 9
 The Supreme Court granted certiorari to consider two issues: (1) whether federal common law, rather than state law, "determines whether the knowledge of corporate officers acting against the corporation's interest will be imputed to the corporation;" and (2) even if state law decides that question, whether federal common law will "determine[ ] the more narrow question whether knowledge by officers so acting will be imputed to the FDIC when it sues as receiver of the corporation." O'Melveny, --- U.S. at ----, 114 S.Ct. at 2052.
 
 
 10
 Noting that "the FDIC was asserting in this case causes of action created by California law," the Court answered the first question in the negative, finding the Ninth Circuit's reliance on federal common law "plainly wrong." Id. The circuit court had relied on three cases in divining a federal common-law basis for its decision. The Supreme Court distinguished those cases on the principle that, while a federal cause of action may be governed by federal policies, state-law causes of action are properly governed by state law:
 
 
 11
 In Cenco, where the cause of action similarly arose under state common law, the Seventh Circuit's analysis of the "circumstances under which the knowledge of fraud on the part of the plaintiff's directors [would] be imputed to the plaintiff corporation [was] merely an attempt to divine how Illinois courts would decide that issue." Schacht, 711 F.2d, at 1347 (citing Cenco, 686 F.2d, at 455). Likewise, in Investors Funding, the District Court analyzed the potential affirmative defenses to the state-law claims by applying "[t]he controlling legal principles [of] New York law." 523 F.Supp., at 540. In Schacht, the Seventh Circuit expressly noted that "the cause of action [at issue] arises under RICO, a federal statute; we therefore write on a clean slate and may bring to bear federal policies in deciding the estoppel question." 711 F.2d, at 1347.
 
 
 12
 O'Melveny, --- U.S. at ----, 114 S.Ct. at 2053 (discussing Cenco Inc. v. Seidman & Seidman, 686 F.2d 449 (7th Cir.1982), In re Investors Funding Corp. of N.Y. Securities Litigation, 523 F.Supp. 533 (S.D.N.Y.1980), and Schacht v. Brown, 711 F.2d 1343 (7th Cir.1983)) (alterations in original). We quote this passage at length because, as discussed below, it furnishes a principal point of distinction from Diamond.
 
 
 13
 The Supreme Court in O'Melveny "turn[ed], then, to the more substantial basis for the [Ninth Circuit decision], which asserts federal pre-emption not over the law of imputation generally, but only over its application to the FDIC suing as receiver." --- U.S. at ----, 114 S.Ct. at 2053. That question is made to depend in part on the statutory provision that provided the FDIC with the authority to bring the action in the first instance--12 U.S.C. Sec. 1821(d)(2)(A)(i)--which is captioned "Powers and duties of [the FDIC] as ... receiver," and which states that "the [FDIC] shall ... by operation of law, succeed to ... all rights, titles, powers, and privileges of the insured depository institution...." The O'Melveny opinion construed this language to place the FDIC as receiver "into the shoes of the failed S & L, obtaining the rights of the insured depository institution that existed prior to receivership." O'Melveny, --- U.S. at ----, 114 S.Ct. at 2054 (internal quotations and citations omitted).
 
 
 14
 The Court rejected the FDIC's argument that this statutory provision "should be read as a nonexclusive grant of rights to the FDIC receiver, which can be supplemented or modified by federal common law," concluding that the argument is "demolished by those provisions of FIRREA which specifically create special federal rules of decision regarding claims by, and defenses against, the FDIC as receiver." Id. (citing, inter alia, 12 U.S.C. Secs. 1821(e)(1), (3)). Because Congress demonstrated that it could provide a federal rule of decision where it so intended, it became "hard to avoid the conclusion that Sec. 1821(d)(2)(A)(i) places the FDIC in the shoes of the insolvent S & L, to work out its claims under state law, except where some provision in the extensive framework of FIRREA provides otherwise." Id.
 
 
 15
 That, however, did not completely put the appeal to rest. The Court noted that the FDIC's receivership began in 1986, some three years prior to the effective date of FIRREA. Reluctant to address the question of FIRREA retroactivity where the issue had not been briefed by the parties, the Court instead proceeded to analyze the case "assuming the inapplicability of FIRREA...." --- U.S. at ----, 114 S.Ct. at 2055. The outcome did not change. The Court ruled that the FDIC could not prevail because its claim was not "one of those cases in which judicial creation of a special federal rule would be justified." Id. The judicial creation of a federal rule of decision is justified only to resolve a " 'significant conflict between some federal policy or interest and the use of state law.' " Id. (quoting Wallis v. Pan American Petroleum Corp., 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966)). In O'Melveny, "[t]he closest [the FDIC came] to identifying a specific, concrete federal policy or interest that is compromised by California law [was] its contention that state rules regarding the imputation of knowledge might 'deplet[e] the deposit insurance fund.' " --- U.S. at ----, 114 S.Ct. at 2055 (quoting FDIC brief). The court rejected this argument emphatically:
 
 
 16
 neither FIRREA nor the prior law sets forth any anticipated level for the fund, so what [the FDIC] must mean by "depletion" is simply the foregoing of any money which, under any conceivable legal rules, might accrue to the fund. That is a broad principle indeed, which would support not just elimination of the defense at issue here, but judicial creation of new, "federal-common-law" causes of action to enrich the fund. Of course we have no authority to do that, because there is no federal policy that the fund should always win. Our cases have previously rejected "more money" arguments remarkably similar to the one made here.
 
 
 17
 Id. (citing United States v. Kimbell Foods, Inc., 440 U.S. 715, 737-38, 99 S.Ct. 1448, 1463-64, 59 L.Ed.2d 711 (1979); United States v. Yazell, 382 U.S. 341, 348, 86 S.Ct. 500, 504, 15 L.Ed.2d 404 (1966)).
 
 
 18
 The Court found no more persuasive the FDIC's even broader argument that it would somehow " 'disserve the federal program' " to permit state law to create defenses to lawsuits that would "impos[e] costs 'on the nation's taxpayers, rather than on the negligent wrongdoer.' " O'Melveny, --- U.S. at ----, 114 S.Ct. at 2055 (quoting FDIC brief). In short, the Court categorically rejected arguments that do no more than "demonstrate[ ] the runaway tendencies of 'federal common law' untethered to a genuinely identifiable (as opposed to judicially constructed) federal policy." Id. Holding that "this is not one of those extraordinary cases in which the judicial creation of a federal rule of decision is warranted," id. at ----, 114 S.Ct. at 2056, the Court reversed the decision, and remanded to the Ninth Circuit to decide what the state law actually provides.
 
 Discussion
 
 19
 O'Melveny furnishes ordering principles by which we can test our decisions on key issues in this case. We conclude that these ordering principles justify our original conclusions and validate our original analysis.
 
 
 20
 The Court's conclusion in O'Melveny is fully applicable to this case: "this is not one of those extraordinary cases in which the judicial creation of a federal rule of decision is warranted." --- U.S. at ----, 114 S.Ct. at 2056 (emphasis added). We never believed otherwise. Rather, this case is one (quoting O'Melveny again) in which the cause of action arises out of a "provision[ ] of FIRREA which specifically create[s] [a] special federal rule[ ] of decision...." Id. at ----, 114 S.Ct. at 2054 (citing, inter alia, 12 U.S.C. Sec. 1821(e)(1)). That Congressionally-created rule of decision expressly grants the RTC the power to abrogate valid contracts and leases where the agency has determined that they are burdensome. Unless the RTC repudiates a burdensome contract or lease, the law of each state will furnish the contract principles that govern the relationship; the RTC, like the FDIC in O'Melveny, steps into the shoes of another entity having claims, rights, powers and causes of action defined and limited by state law. However, when the RTC does exercise its federally-granted power to repudiate a contract or lease, its power to do so is not subordinated to state statutes or regulations. Section 1821(e)(1) is an express grant of federal power exercisable in derogation of all contrary state law, and it therefore supersedes--or preempts--volumes of state law. This distinction is drawn in O'Melveny, where "the FDIC was asserting ... causes of action created by [state] law," --- U.S. at ----, 114 S.Ct. at 2052, and confirms the result in Diamond.
 
 
 21
 Nevertheless, in order to assure that our opinion is analytically congruent with O'Melveny throughout, we need to declare certain premises that were left implicit in our earlier opinion, refine some terms of reference, and address specifically the arguments that New York and the tenants predicate upon O'Melveny. Thus we now undertake to clarify Diamond, modifying it in the single respect referenced earlier.
 
 
 22
 A. Construction of phrase "contract or lease."
 
 
 23
 In Diamond, we framed as a central issue whether the tenancies in question had the nature of a "contract or lease," and were therefore subject to the RTC's repudiation power. We stated that, "[f]or these purposes, the definition of the phrase 'contract or lease' is a matter of federal law." 18 F.3d at 118. Nothing in O'Melveny (or in the many cases cited by New York and the tenants in their latest briefing) militates against that approach.[2]
 
 
 24
 New York and the tenants point to the O'Melveny principle that we may not "adopt a court-made rule to supplement federal statutory regulation that is comprehensive and detailed; matters left unaddressed in such a scheme are presumably left subject to the disposition provided by state law." O'Melveny, --- U.S. at ----, 114 S.Ct. at 2054. According to New York, this means that words and terms that are not expressly defined in FIRREA must be construed according to New York law. We disagree. Our reading of the cases cited by the Court following this quotation demonstrates to us that the Court had in mind court-created remedies and causes of action, not definitions of terms used in a federal statute.
 
 
 25
 Thus, in Northwest Airlines, Inc. v. Transport Workers Union of America, AFL-CIO, 451 U.S. 77, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981), the Court held that there is no implied right of contribution in either Title VII of the 1964 Civil Rights Act or in the Equal Pay Act: "The presumption that a remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme.... The judiciary may not, in the face of such comprehensive legislative schemes, fashion new remedies that might upset carefully considered legislative programs." 451 U.S. at 97, 101 S.Ct. at 1583-84. However, the meaning of words in a federal statute is a different matter: "In almost any statutory scheme, there may be a need for judicial interpretation of ambiguous or incomplete provisions. But the authority to construe a statute is fundamentally different from the authority to fashion a new rule or to provide a new remedy which Congress has decided not to adopt." Id.
 
 
 26
 In the other case cited in O'Melveny, City of Milwaukee v. Illinois and Michigan, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981), the Court held that a comprehensive legislative scheme enacted by Congress displaces previously created federal common-law rights of action. See id. at 319, 101 S.Ct. at 1793 ("The establishment of such a self-consciously comprehensive program by Congress, which certainly did not exist when [the Court created a common-law right of action], strongly suggests that there is no room for courts to attempt to improve on that program with federal common law.") This is an entirely uncontroversial proposition and does not affect in the least our reading of FIRREA.
 
 
 27
 Our decision in Diamond does not (and did not purport to) write federal common law; we did not create a new remedy, cause of action, or rule of decision. We construed the language of a federal statute that by its own terms created a rule of decision; and that enterprise is, and always has been, a matter of federal law. See Molzof v. United States, 502 U.S. 301, 305-07, 112 S.Ct. 711, 715, 116 L.Ed.2d 731 (1992) ("the meaning of the term "punitive damages" as used in [28 U.S.C.] Sec. 2674, a federal statute, is by definition a federal question"); Federal Deposit Ins. Corp. v. Philadelphia Gear Corp., 476 U.S. 426, 431, 106 S.Ct. 1931, 1934-35, 90 L.Ed.2d 428 (1986) (federal law governs meaning of "deposit" in federal statute); Reconstruction Finance Corp. v. Beaver County, 328 U.S. 204, 208, 66 S.Ct. 992, 995, 90 L.Ed. 1172 (1946) ("Pennsylvania's definition of 'real property' cannot govern if it conflicts with the scope of that term as used in the federal statute. What meaning Congress intended is a federal question which we must determine."); Schacht v. Brown, 711 F.2d 1343, 1347 (7th Cir.1983) ("the cause of action [at issue] arises under ... a federal statute; we therefore write on a clean slate and may bring to bear federal policies in deciding the ... question.") (quoted in O'Melveny, --- U.S. at ----, 114 S.Ct. at 2053).
 
 
 28
 Our project in Diamond was to construe the term "contract or lease" in order to decide whether the tenancies at issue fall within the scope of the federal statute. We therefore asked "whether the tenancies in question are contractual in nature or whether the various rent regulations transformed these tenancies into some non-contractual, non-leasehold property interest such that they are outside the scope of the statute." 18 F.3d at 118. To answer that question, we looked to generally applicable, long-standing principles of law. See, e.g., id. ("[a] tenancy is an interest in the exercise of dominion over property for a fixed or computable duration ... initiated by a voluntary contractual arrangement between the landlord and tenant....") (citing Restatement (Second) of Property Sec. 1.4 (1977); N.Y.Gen.Oblig.Law Sec. 5-703 (McKinney 1989)). Our holding--that rent-regulated tenancies are subject to disaffirmation or repudiation by the RTC--was based on the conclusion that these tenancies "are contract-based leaseholds", 18 F.3d at 121, and we therefore rejected New York's argument that the tenancies were purely creatures of statute outside the reach of Sec. 1821(e).
 
 
 29
 It is a "settled principle of statutory construction that, absent contrary indications, Congress intends to adopt the common law definition of statutory terms." United States v. Shabani, --- U.S. ----, ----, 115 S.Ct. 382, 384, 130 L.Ed.2d 225 (1994) (citing Molzof, 502 U.S. at 305-07, 112 S.Ct. at 715). In Molzof, the inquiry was "the meaning of the term 'punitive damages' as used in the [Federal Tort Claims Act]." 502 U.S. at 305, 112 S.Ct. at 715. Although the ultimate issue was the recoverability of certain damages under Wisconsin law, the Court never referred to the law of Wisconsin in defining the term. Rather, it stated that " '[p]unitive damages' is a legal term of art that has a widely accepted common-law meaning; .... a long pedigree in the law." Id. 306, 112 S.Ct. at 715. The Court looked to generic principles and sources of common law, including definitions contained in editions of law dictionaries current when the statute was adopted. See id. (citing to Black's Law Dictionary 501 (3d ed. 1933); The Cyclopedic Law Dictionary 292 (3d ed. 1940)). In so doing, the Court was simply adhering to "[a] cardinal rule of statutory construction":
 
 
 30
 '[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them.'
 
 
 31
 Molzof, 502 U.S. at 307, 112 S.Ct. at 716 (quoting Morissette v. United States, 342 U.S. 246, 263, 72 S.Ct. 240, 250, 96 L.Ed. 288 (1952)).
 
 
 32
 These principles underlie our analysis in Diamond. FIRREA grants the RTC power to disaffirm or repudiate any "contract or lease" that it has found to be burdensome. A contract is "[a] promissory agreement between two or more persons that creates, modifies, or destroys a legal relation." Black's Law Dictionary 394 (4th ed. 1951). A lease is a species of contract--an "agreement which gives rise to [the] relationship of landlord and tenant." Id. at 1035. The lease is a "[c]onveyance, grant or devise of realty for [a] designated period with reversion to [the] grantor." Id. (citing Becker v. Manufacturers Trust Co., 262 A.D. 525, 30 N.Y.S.2d 542, 544 (1941)). The "tenant" is "one who has the temporary use and occupation of real property owned by another person, (called the 'landlord,') the duration and terms of his tenancy being usually fixed by an instrument called a 'lease.' " Id. at 1635.
 
 
 33
 We read New York's submissions to make two arguments in various ways: (1) that rent regulated tenancy in New York is a creature of statute, and fully non-contractual in nature;[3] and (2) that, in any event, nothing in FIRREA allows the RTC to abridge the tenants' statutory right to avoid eviction so long as the state-prescribed rent is paid.
 
 
 34
 O'Melveny does not make more tenable the argument that these tenancies are statutory and not contractual. First, as discussed above, Congress is presumed to have intended the common-law meaning of terms it uses without express definition. A "lease" is a contract conveying a temporary interest in real property, with reversion to the grantor. A contract that is subject to statutory regulation is a contract still. When parties enter into a contract, they are presumed to accept all the rights and obligations imposed on their relationship by state (or federal) law. Norfolk & Western R. Co. v. American Train Dispatchers Ass'n, 499 U.S. 117, 129-31, 111 S.Ct. 1156, 1164, 113 L.Ed.2d 95 (1991); 2 Tudor City Place Associates v. 2 Tudor City Tenants Corp., 924 F.2d 1247, 1254 (2d Cir.), cert. denied, 502 U.S. 822, 112 S.Ct. 83, 116 L.Ed.2d 56 (1991). With respect to residential tenancies, state law may introduce terms or provisions directly into the contract. See Diamond, 18 F.3d at 118 (discussing examples of terms imposed on residential leases, as well as certain terms rendered unenforceable by state law).
 
 
 35
 The tenancies in this case are no different. In each instance, the landlord-tenant relationship was created by a lease, as was the temporary interest in the property. New York's regulations expressly provide that "[t]he provisions of any lease or other rental agreement shall remain in force pursuant to the terms thereof, except insofar as those provisions are inconsistent with the Rent Law or these regulations." N.Y.Comp.Codes R. & Regs. tit. 9, Sec. 2200.13; see also id. at Sec. 2520.12 (same). Thus many of the original lease terms are unaffected by New York's rent regulations. Although the landlord-tenant relationship has been made subject to a variety of laws, including the obligations imposed by New York's rent regulations, the tenancy itself--the interest in the property--was created by the lease. Congress could not have intended that the RTC would have the power only to disaffirm or repudiate a piece of paper, or certain sections of that document. Rather, Congress must have intended that the repudiation reach the relationships and interests that the document creates. Section 1821(e) therefore confers the power to repudiate or disaffirm the grant or conveyance of the property interest, i.e., the temporary estate in property held by the tenant. Once this "determination" of the temporary estate has occurred, possession reverts to the holder of the fee simple--the owner, who in this case is the RTC. See Baker v. Latham Sparrowbush Assoc., 808 F.Supp. 992, 1008-09 (S.D.N.Y.1992) (under N.Y. law, possession reverts to owner upon termination of tenancy); see also N.Y. Estates, Powers and Trusts Law Sec. 6-4.4 (McKinney 1992) ("A reversion is the future estate ... left in the creator ... upon the simultaneous creation of one or more lesser estates...."). In short, we reaffirm our original conclusion: the rent regulations at issue here "merely involve[ ] restrictions imposed on existing tenancies...." Seawall Associates v. City of New York, 74 N.Y.2d 92, 544 N.Y.S.2d 542, 548, 542 N.E.2d 1059, 1064, cert. denied, 493 U.S. 976, 110 S.Ct. 500, 107 L.Ed.2d 503 (1989). Therefore, the tenancies are fully subject to the RTC's repudiation power.
 
 
 36
 B. New York's anti-eviction provisions.
 
 
 37
 In our original opinion we did not address New York's claim that the tenant's statutory freedom from eviction survives repudiation. Under New York's rent regulations, the landlord is forbidden (except under certain limited circumstances) from evicting any tenant who proffers the monthly rent payments in a timely manner. See N.Y.Comp.Codes R. & Regs. tit. 9, Sec. 2524.1(a) ("As long as the tenant continues to pay the rent ... no tenant shall be denied a renewal lease or be removed from any housing accommodation", except on specified grounds) (governing rent-stabilized tenancies); see also N.Y.City Admin.Code Sec. 26-408a ("No tenant, so long as he or she continues to pay the rent ... shall be removed from any housing accommodation which is subject to rent control ... notwithstanding the fact that the tenant has no lease or that his or her lease ... has expired or otherwise terminated...."). Do these anti-eviction laws bar the RTC from effecting a complete dissolution of the tenancy? That question requires us to address an issue we did not reach in our prior opinion: "conflict" preemption. See Diamond, 18 F.3d at 125 ("Having held that Sec. 1821(e) expressly authorizes RTC to repudiate the tenancies at issue, we have no occasion to reach or address 'conflict' preemption...."). We did not reach the issue because rent-regulated tenancies are contractual and thus fall within the express scope of FIRREA. We still adhere to this view; however, we should have directly addressed the more narrow question of whether, after repudiation, the RTC is still bound by the rent regulations to accept the state-regulated rent in exchange for the tenant's continued occupation of the property. We do not think that New York's rent regulations bar the RTC from taking steps necessary to fully effect a repudiation of the tenancy.
 
 
 38
 It is basic that the supremacy clause of the Constitution "invalidates state laws that 'interfere with or are contrary to, the laws of congress....' " Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981) (quoting Gibbons v. Ogden, 9 Wheat. 1, 211, 6 L.Ed. 23 (1824)). Although preemption may arise in several ways, only one concerns us: "when the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " Michigan Canners & Freezers Assoc., Inc. v. Agricultural Marketing & Bargaining Bd., 467 U.S. 461, 469, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984) (quoting Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). Such "conflict" preemption will be found where "state law ... interferes with the methods by which the federal statute was designed to reach [its] goal." International Paper Co. v. Ouellette, 479 U.S. 481, 494, 107 S.Ct. 805, 813, 93 L.Ed.2d 883 (1987).
 
 
 39
 The goal of FIRREA is to stem the "financial hemorrhaging" resulting from the large number of failures in the thrift industry. See Diamond, 18 F.3d at 113. To that end, "Congress required that RTC conduct its operations 'in a manner which [ ] maximizes the net present value return from the sale or other disposition of' thrift assets that come into its hands." Id. (quoting 12 U.S.C. Sec. 1441a(b)(3)(C)(i), and citing S.Rep. No. 19, 101st Cong., 1st Sess. 352 (1989) U.S.Code Cong. & Admin.News 1989, p. 86). It is pursuant to this overarching mandate that "Congress armed [RTC] with the power to disaffirm or repudiate contracts or leases that RTC in its discretion determines to be burdensome." Id. (citing 12 U.S.C. Sec. 1821(e)(1)).
 
 
 40
 Therefore, the entire purpose underlying RTC's repudiation power is the maximization of return on assets. To that end, Congress conferred on the RTC power to repudiate leases it deems burdensome. Here, the burden is the regulated rent and the diminished asset value that the rent-regulation causes. A state law that obliged the RTC to accept the tenancy in exchange for the regulated rent payment would simply continue the (repudiated) leasehold subject to the same burden. It is obvious that this state of affairs would nullify the FIRREA power to repudiate burdensome leases.
 
 
 41
 We are mindful that when analyzing a preemption issue we must be more deferential where a state is exercising its traditional police powers. See, e.g., Cipollone v. Liggett Group, Inc., --- U.S. ----, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992); Ray v. Atlantic Richfield Co., 435 U.S. 151, 157, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978); Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). But where there is a direct and irreconcilable conflict, the state law must yield. See Michigan Canners & Freezers, 467 U.S. at 469, 104 S.Ct. at 2523. General preemption "principles are not inapplicable here simply because real property law is a matter of special concern to the States: 'The relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for the Framers of our Constitution provided that the federal law must prevail.' " Fidelity Federal Savings & Loan Assoc. v. De La Cuesta, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982) (quoting Free v. Bland, 369 U.S. 663, 666, 82 S.Ct. 1089, 1092, 8 L.Ed.2d 180 (1962)).
 
 
 42
 In this case, the non-eviction aspect of the state's rent-regulation scheme directly interferes with the "accomplishment and execution of the full purposes and objectives of Congress." Michigan Canners & Freezers, 467 U.S. at 469, 104 S.Ct. at 2523 (citations omitted). The tenancies at issue are rooted in contract; RTC has the power to repudiate the contracts, and therefore the underlying tenancies. If the state anti-eviction law were to govern, the repudiation would be fruitless. We therefore hold that, to the extent that the anti-eviction provisions of New York's rent regulations interfere with the operation of Sec. 1821(e), the state regulations and laws are preempted by FIRREA.
 
 
 43
 C. The "term of the lease."
 
 
 44
 Having reaffirmed our holding in Diamond that these tenancies are subject to repudiation by the RTC, we now address one final issue--the remaining leasehold term. "Once RTC repudiates a lease, a tenant may choose to 'remain in possession of the leasehold interest for the balance of the term of the lease....' " Diamond, 18 F.3d at 123 (quoting 12 U.S.C. Sec. 1821(e)(5)(A)(ii)). Although the definition of "term," like that of "contract or lease," is a federal question, the meaning of that word is not at issue; the issue here is the substantive question of the specific time period of the term for rent-regulated tenancies. O'Melveny counsels that, where Congress has not provided a specific rule of decision, the courts should look to state law to fill in these interstices. In respect of FIRREA then, what that term is in any particular case, is a matter of contract provisions or state law.
 
 
 45
 In our prior opinion, we rejected the argument of New York and the tenants that the term of a rent-regulated lease under New York law is essentially perpetual, lasting for so long as (a) the tenant continues to pay the regulated monthly rent and (b) the World War II housing crisis is perpetuated. Diamond, 18 F.3d at 123. We did so because "the power of repudiation under section 1821(e) was conferred in aid of an acute financial emergency, and cannot be construed fairly to accommodate so prolonged a residual tenancy." Id. Moreover, we decided that we could not use New York's "statutory occupancy rights to delimit the leasehold for FIRREA purposes" because a perpetual term might run afoul of takings jurisprudence. Id. at 123-24 (citing Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 440, 102 S.Ct. 3164, 3178, 73 L.Ed.2d 868 (1982); Block v. Hirsh, 256 U.S. 135, 157, 41 S.Ct. 458, 460, 65 L.Ed. 865 (1921)).
 
 
 46
 We adhere to that view. Having held that the RTC has the power to repudiate rent-regulated tenancies, we could not permit the state to nullify the RTC's federal power by imposing a residual lease term that runs in perpetuity; nor, for the same reason, could we accept a term measured by a tenant's willingness to continue to pay rent (at the previous rate). The foregoing discussion of conflict preemption applies with equal force to this issue. Were the term under state law to run in perpetuity, or be subject to the will of the tenant, a situation would arise where "state law ... interferes with the methods by which the federal statute was designed to reach [its] goal." International Paper Co. v. Ouellette, 479 U.S. 481, 494, 107 S.Ct. 805, 813, 93 L.Ed.2d 883 (1987). A perpetual lease term would cement what the RTC has determined to be a "burdensome" relationship, thereby impeding its efforts to maximize the economic return on assets.[4] Such a result is barred by the doctrine of preemption, because it " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " Michigan Canners & Freezers, 467 U.S. at 469, 104 S.Ct. at 2523 (citations omitted).
 
 
 47
 For this reason, we held in Diamond that the term of a rent-stabilized tenancy would run to the expiration of the current lease. 18 F.3d at 123. For rent-controlled tenancies, looking for the strongest analogy to a lease expiration, we held that "the lease term ends, ... on the biennial January 1 date on which the landlord next becomes entitled (following the notice of repudiation) to a review of the maximum base rent." Id. at 124. On reconsideration, however, we have noticed a potential problem with this holding: if the repudiation occurs immediately prior to that January 1 date, the remaining lease term calculated this way could be as short as several days or weeks. This would, of course, serve the federal scheme. However, this federal scheme is displacing state laws and regulations adopted pursuant to the state's police power. Since preemption is particularly disfavored where a state's police power is at issue, we ought to accommodate--as best as we can--the state interest at stake. See, e.g., Cipollone, --- U.S. at ----, 112 S.Ct. at 2617 (" 'the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress.' ") (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). That state interest looks unfavorably upon remedies which provide for immediate eviction of the tenant. See, e.g., Manocherian v. Lenox Hill Hosp., 84 N.Y.2d 385, 395, 618 N.Y.S.2d 857, 862, 643 N.E.2d 479, 484 (N.Y.1994) ("central, underlying purpose of the [Rent Stabilization Law] is to ameliorate the dislocations and risk of widespread lack of suitable dwellings"); but see id. at 399, 618 N.Y.S.2d 857, 643 N.E.2d 479 ("another goal of the [Rent Stabilization Law] ... [is] to free up apartments, fairly and appropriately, as soon as practicable").
 
 
 48
 Fortunately, there is a close analog in state law that balances these competing objectives. In reconsidering our previous opinion, we reviewed legislation, recently enacted in New York, that implements the de-regulation of tenancies for which the monthly rent exceeds $2,000 and the annual family income of the tenant exceeds $250,000 for the two preceding calendar years. See 1993 Sess.Law News of N.Y., 216th Legislature, Ch. 253 (McKinney's 1993) (codified at various places in N.Y.Unconsol.L., Tax L.); see, e.g., Admin.Code of City of New York Secs. 26-403.1 (rent control de-regulation); 26-504.3 (rent stabilization de-regulation). This law calculates when the regulated tenancy expires, after income reporting by tenants in higher-rent dwellings and certification by the landlord to the state that the pre-conditions have been met. For rent-stabilized dwellings, de-regulation occurs "upon the expiration of the lease." Admin.Code of City of New York Sec. 26-504.3(b). That coincides exactly with our ruling in Diamond. For rent-controlled dwellings, de-regulation occurs "as of the first day of June in the year next succeeding the filing of the certification of the owner." Id. at Sec. 26-403.1. Measured from the date the tenant is required to return the income reporting form to the landlord (no later than May 31), the de-regulation of a rent-controlled tenancy occurs one year later.[5] In deference to state law (which, under O'Melveny, governs this area), we adopt this framework, which is the closest analog we find to the RTC's repudiation of tenancies in this case.
 
 Conclusion
 
 49
 For the foregoing reasons, upon reconsideration after remand, we reinstate our previous opinion, Resolution Trust Corp. v. Diamond, 18 F.3d 111 (2d Cir.1993), except for the holding in respect of the post-repudiation rights of rent-controlled tenants. For each such tenant, the term of the tenancy shall expire one year from the date the tenant was served with notice of the RTC's election to repudiate the lease. The district court is directed to re-enter judgment consistent with our two opinions.
 
 
 
 [1]
 Our decision also addressed separate issues involving Lloyd Ribner, a defendant claiming a right of succession to the tenancy of his deceased mother, Muriel Ribner. We conclude that O'Melveny does not affect the issues addressed in that part of our decision, and therefore reinstate without modification the section of the opinion addressing Ribner without further comment
 
 
 [2]
 As discussed below, we did, however, use longstanding common-law principles to inform our decision. Thus we used, rather than ignored, state law in defining the terms
 
 
 [3]
 Thus, according to New York, a tenant's right to remain in possession of a rent-regulated dwelling derives solely from the emergency rent laws. This is an argument we first encountered and addressed in Diamond. Our discussion there reflects our conclusion that, even if New York law were to apply, the outcome would not change:
 The voluntary and contractual aspects of the rent-control [and rent-stabilization] arrangement[s] distinguish [them] from the kind of housing measure invalidated by the New York Court of Appeals as an unconstitutional taking in Seawall Associates v. City of New York, 74 N.Y.2d 92, 544 N.Y.S.2d 542, 542 N.E.2d 1059, cert. denied, 493 U.S. 976, 110 S.Ct. 500, 107 L.Ed.2d 503 (1989). There, the Court of Appeals struck down a local ordinance requiring owners of properties used as single-room occupancy housing ("SROs") to rehabilitate their buildings for use as SROs indefinitely, and contrasted that with rent regulations such as those in this case: "[t]he rent-control and other landlord-tenant regulations that have been upheld ... merely involved restrictions imposed on existing tenancies where the landlords had voluntarily put their properties to use for residential housing." 544 N.Y.S.2d at 548, 542 N.E.2d at 1064. The SRO ordinance was found to be a per se taking because its coercive design eliminated the voluntary and contractual nature of the landlord-tenant relationship, and " 'interfere[s] so drastically' ... with the SRO property owners' fundamental rights to possess and exclude." 544 N.Y.S.2d at 548, 542 N.E.2d at 1065 ....
 Diamond, 18 F.3d at 121. Because we hold that a rent-regulated tenancy is contractual, we have no occasion now to resolve the issue we framed in Diamond: that New York's rent-regulations--were they to fully displace a voluntary and contractual tenancy with a pure statutory right to possession of the property--might be vulnerable to the same takings challenge that succeeded in Seawall.
 
 
 [4]
 In their briefs, New York and the tenants equate this view with the "more money" argument rejected in O'Melveny. See --- U.S. at ----, 114 S.Ct. at 2048. We see no parallels. In O'Melveny, the federal court presumed that the general goal of asset maximization warranted overriding state-law defenses to state-law claims; here, Congress has expressly done so. See 12 U.S.C. Sec. 1441a(b)(3)(C)(i). In O'Melveny, the federal court adopted rules of decision to implement that goal; here, the repudiation is effected by the agency itself--pursuant to an express grant of statutory power. In O'Melveny, the federal court decided what burdens warranted superseding state common law; here, the RTC is granted express statutory authorization to exercise its discretion in deciding which leases are "burdensome." See 12 U.S.C. Sec. 1821(e)
 
 
 [5]
 The law also provides that, where the tenant refuses to return the form to his landlord, the landlord may have the State check the tenant's income tax records and certify that the tenant's income has exceeded the statutory threshold for de-regulation of rent. Admin.Code of City of New York Sec. 26-403.1(c)(1). In such instances, where the tenant fails to cooperate, de-regulation occurs on March 1 of the next year. Sec. 26-403.1(c)(2)