OPINION OF THE COURT
Lewis R. Friedman, J.
This proceeding has been commenced pursuant to Housing *482 Maintenance Code (HMC) § D26-51.01 (h) (Administrative Code of City of New York) for an order directing the owner and managing agent (collectively, the owners; see, HMC § D26-1.07 [45]) to remove the "conditions constituting violations” at the premises. One of the exterior walls at 41-43 Avenue B (the premises) has collapsed. The building has been vacated as the result of a Department of Buildings (DOB) vacate order; the tenants, petitioners here, are temporarily housed elsewhere. The Department of Housing Preservation and Development (DHPD), although a statutory respondent, strongly supports the petitioners.
At the trial owners did not dispute the existence or seriousness of the damage to the premises. Unusual issues arise in this case because the owners contend that they need not do the repairs because they are too expensive.
A number of tenants testified to conditions that began to deteriorate in April. During the course of a nonpayment proceeding before Judge Rios one of the tenants complained of various leaks and cracks. In an April 8 stipulation the owner agreed to repair the south wall of the apartment and to abate any violations by April 19. On April 22 DOB issued a hazardous violation; the rear wall was "defective and bulged out (aprox IV2 ft.)”. The proposed remedy was to "make all necessary repairs to defective rear wall”. A DOB peremptory vacate order, pursuant to Administrative Code § C26-84.0, was issued that day. The tenants were removed by the police and assisted by various social service agencies.
The rear wall did collapse on April 27. On May 2 DHPD, pursuant to HMC §§ D26-54.01 and D26-56.01, issued orders to "repair/vacate” the premises. Those orders noted numerous conditions including the collapse of the rear wall, the sagging of the front facade, the main girder pulling away from the ceiling of the cellar, a foundation wall in danger of collapse, and various joists sagging.
Testimony by two contractors and an engineer, witnesses for the owners, estimated the costs of restoration at $600,000 to $850,000 and differed materially on what work was actually required. In contrast testimony by an engineer and a construction consultant, witnesses for the tenants, estimated the costs of structural repairs at $170,000 with an additional $150,000 to $600,000 for interior work depending on the desired degree of improvement to the original condition of the premises.
The premises was purchased on October 22, 1985 at a cost of *483 $390,000: $60,000 cash, the assumption of a $45,000 first mortgage, and a purchase-money mortgage for $285,000, which provided for the payment of interest only until October 21, 1995, when the entire balance was due. Reports from DOB, DHPD, Department of Air Resources, Emergency Repairs, Fire Department, and Department of Transportation (Sidewalks) were all ordered as part of the title examination. However, prior to the closing, respondent Stanley Vickers, the managing agent, had only seen one apartment; to his knowledge no prepurchase engineering report had been ordered for the premises.
At trial Mr. Vickers produced an operating statement for the building showing a "net operating loss” of $15,726.96 per year. Several of the apartments were vacant and had been so for some time prior to the vacate order. The figures for "repairs & vacancies” were based on "estimates” since there had not been adequate time under the current ownership for any actual figures to have been developed. The "net operating loss” included $33,067 for payments on the first and second mortgages.
The owners offered no explanation of how the building would have made a profit even if the collapse had not occurred; that is, their figures showed a net loss without a catastrophe. All tenants are subject to either rent control or rent stabilization. No figures were offered on the total economic viability of the building including income tax considerations.
The proof proffered by the owners included no statements of the market value of the premises. The owners’ witness denied any knowledge of current offers for the property. There was no proof of what the property would be worth if the tenants’ rights could be successfully terminated.
DISCUSSION
This case presents issues different from those previously reported. The owner here is arguing that the court cannot compel the reconstruction of a damaged building where the cost of repair is extensive. This court has previously concluded that there is power to order the removal of "conditions constituting violations” in a residential premises regardless of the cause of the condition. (See, e.g., Chan v 60 Eldridge Corp., 129 Misc 2d 787 [Civ Ct, NY County 1985]; Fernandez v Tsoumpas Bros. Co., 126 Misc 2d 430 [Civ Ct, NY County 1984]; Rodri *484 guez v Westco Realty Co., 133 Misc 2d 283 [Civ Ct, NY County].) The HMC at section D26-1.03 declares that:
"The sound enforcement of minimum housing standards is essential * * *
"2. to prevent adequate or salvageable housing from deteriorating to the point where it can no longer be reclaimed * * *
"3. to bring about the basic decencies and minimal standards of healthful living in already deteriorated dwellings, which, although no longer salvageable, must serve as habitations until they can be replaced.”
In the case of 41-43 Avenue B the court concludes that the credible evidence establishes that the conditions are capable of being repaired.
The court finds that the owners have failed to terminate the tenancies of the petitioners. The law is well settled that the mere destruction of a portion of a building or the issuance of DOB or DHPD vacate orders does not terminate tenancies. (See, e.g., Chan v 60 Eldridge Corp., supra; Various Tenants of 515 E. 12th St. v 515 E. 12th St., 128 Misc 2d 235 [Civ Ct, NY County 1985]; Miller v Notre Dame Hotel, NYLJ, Dec. 17, 1980, at 11, col 3 [Civ Ct, NY County].) Unless a landlord carefully follows the provisions of a lease even the substantial damage of a building by fire does not serve to terminate a tenancy. (See, e.g, General Outdoor Adv. Co. v Wilson, 276 App Div 63 [3d Dept 1949]; Sabre Realty Mgt. Corp. v Vitale, 94 Misc 2d 1035 [Civ Ct, Kings County 1978].) In the case of residential units governed by rent control or rent stabilization, there are additional requirements before the tenancy can be terminated. (Various Tenants of 515 E. 12th St. v 515 E. 12th St., supra; Miller v Notre Dame Hotel, supra.)
Some cases have invoked the "marine rule” that if the cost of restoration is more than one half of the value of the building there is a total destruction and repair is not required. (Corbett v Spring Garden Ins. Co., 155 NY 389, 40 App Div 628, affd 167 NY 596; Sabre Realty Mgt. Corp. v Vitale, supra; Fernandez v Tsoumpas Bros. Co., supra.) The cases have concluded that the marine rule should not be applied mechanically. (Sabre Realty Mgt. Corp. v Vitale, supra; General Outdoor Adv. Co. v Wilson, supra.) Judge George of this court has correctly concluded that the legislative purpose of the rent regulations makes the application of the marine rule to residential real estate contrary to public policy. (Fernandez v Tsoumpas Bros. Co., 126 Misc 2d 430, 433, supra.) Whatever *485 may be said for the viability of the rule in a commercial setting it should not be applied at all where, as here, there are protected tenancies.
The economic realities do not support the application of any mechanical, marine rule, computation here. The court, as a result of its trial of many cases, is familiar with the area of Manhattan surrounding the premises. It is a "hot” location where major economic forces seek to "upgrade” the buildings and, concomitantly, the rent rolls. There are also strong community pressures seeking to stop the "gentrification” of the neighborhood. An unfortunate occurrence such as a fire often serves as the impetus for the removal of the tenants. (See, Rodriguez v Westco Realty Co., supra.)
The court is well aware of the basic axiom of Manhattan residential real estate: vacant buildings are worth substantially more than property that is burdened with rent-controlled and rent-stabilized tenants. The record here is barren of proof of the current value of the premises either with the existing tenancies or with the tenancies terminated. The purchase price of $390,000, of which only $60,000 was cash, in October 1985 is some proof of value of the building with the tenancies in place. The owners assert that the building loses nearly $16,000 per year if fully rented at the current rent levels. Surely it would be worth substantially more vacant. Since the owners have the burden of proof on the issue of why they should not remedy the conditions (Chan v 60 Eldridge Corp., supra), they cannot apply the marine rule for their benefit.
The court credits the tenants’ expert’s valuation of the cost of repair. The structural work will cost $170,000 and the interior work $150,000. The tenants’ witness was credible and explained the conditions needing repair in a straightforward forthright manner. The witnesses for the owners testified in a conclusionary fashion which lent little to their credibility. Further the court finds that their estimates are based on the creation of luxury conditions which are not required by law. (Fernandez v Tsoumpas Bros. Co., supra.) "Repair” of conditions and the removal of violations is not the basis for the decision to upgrade the property and, no doubt, to raise the rents.
Further the proof is strongly susceptible to the conclusion that the owners had no interest in the physical condition of the property when they purchased it. No engineer’s inspection *486 was ordered even though sidewalk repair liens were examined. The owners’ conduct is consistent with a desire to allow the building to deteriorate to the point where it would fall down, as it did.
The owners’ attempt to show that the operation of the building would not be profitable if the repairs were done was unconvincing. According to the owners’ own estimates, which were not based on "hard” data, the building would operate at a $16,000 net loss even if the three vacant apartments were rented at the maximum allowable rent. No economic justification of any kind for the purchase of the building was proven. Accordingly, the consequences of the repair of the damage cannot be evaluated on an economic basis. If economic issues are tendered by an owner to avoid repair of a residential building, the lack of proof on those issues justifies the rejection of the claim. (50 W. 69th St. Tenants Assn. v Widlanski, Civ Ct, NY County, HP13199/86, July 21, 1986.)
The court finds that the petitioners are entitled to an order to correct the conditions. Clearly the work will take substantial time. The court will therefore set a schedule in the order to be settled.