OPINION OF THE COURT
Peter M. Wendt, J.
This Housing Part (HP) proceeding involves a building that was severely damaged by fire on February 7, 1994. The six-story, 60-unit, 70-year-old building is owned as a cooperative, and was nearly fully occupied at the time of the fire. Petitioners are the rent-stabilized tenants and proprietary lessees who occupied the building at the time of the fire. Respondents are the cooperative corporation, the sponsors who still hold approximately two thirds of the shares in the cooperative as holders of unsold shares, the mortgagee, and the Department of Housing Preservation and Development of the City of New York (hereinafter DHPD).[1] Currently, the building is unoccupied and uninhabitable. Although a vacate order has been issued by the Department of Buildings because of its hazardous condition, the court conducted a personal inspection of the accessible areas of the premises on August 4, 1995. Most of the roof and sixth floor were demolished, and portions of them had collapsed into the fifth floor. The balance of the building was badly damaged by the water required to extinguish the fire. By means of the stairway, the court was able to obtain access to the only portion of the roof remaining. From that vantage *506 point, as well as the remaining portions of the sixth floor, the severe destruction of the upper portion of the building was visible. Although the water damage below the fifth floor is serious, the structure there, including walls and floor, appeared still solid and fully in existence.
Respondents claim the building is so badly destroyed that to require repairs would be economically infeasible. To require restoration, it is argued, would work an unconstitutional taking in violation of the Fifth and Fourteenth Amendments to the United States Constitution. They ask the court to apply the marine rule, and claim that since restoration would cost more than half the market value of the premises, the building must be considered totally destroyed for purposes of this decision. Respondents use the term "reconstruct” rather than "repair”, and explain that petitioners are seeking an order requiring thein to construct a building where one no longer exists.[2] It is to this purpose that the court inspected the building. Although the building is in dire condition, it is clearly "there”.[3] The floors and walls of the first five stories are solid. The fifth story has severe damage, but also has solid walls and floors; the ceiling, however, is almost completely destroyed. The sixth story is effectively gone for all practical purposes, except for the exterior walls, which have also sustained visible damage around the parapets. The roof is a total loss. However, most of the building exists, although in very poor condition. It is also evident from the expert testimony offered by both sides that the cost of repairs would most likely exceed the market value of the restored building. The estimated cost of repairs varied -widely. Expert witnesses for the different parties estimated the cost as $2,759,955, $4,915,015 and $5,147,979, respectively. The value of the building was determined to be $1,960,000-$5,020,000, $420,000-$870,000, or $820,000-$!,100,000, respectively, depending upon which testimony is accepted. The question is, would requiring restoration amount to an unconstitutional taking?
*507 Before the fire, the building was adequately maintained. The tenants do not dispute this, but argue respondents failed to prove economic infeasibility for several reasons, including, inter alia, their failure to present any evidence regarding the cost to respondents if the building is not restored. Petitioners also claim that in any event respondents brought the economic hardship on themselves by knowingly underinsuring the building.
The court shall first deal with the question of whether the marine rule should apply. The marine rule has often been invoked in cases that concern commercial premises. Although the marine rule has been discussed in cases concerning severe damage to residential premises, the court has never directly applied it. The facts of the present case do not warrant its application.
Historically, the marine rule has been applied in marine insurance cases regarding the destruction of ships. The Court of Appeals, in Corbett v Spring Garden Ins. Co. (155 NY 389 [1898]), applied the marine rule to interpret the extent of damages and remedies for an insurance policy of the plaintiff’s leasehold interest in a commercial building which had been damaged by fire. Subsequently, it has been applied in landlord-tenant disputes concerning commercial premises. The marine rule has been used in interpreting clauses in leases to determine the required extent of damage to a building in order to find whether the right exists to terminate a tenancy after a building has been damaged by fire. The marine rule states that if the cost of restoration of the building to the condition it was in immediately preceding the fire is more than one half the value of the building prior to the fire, then there is deemed a total destruction and repair is not required. (General Outdoor Adv. Co. v Wilson, 276 App Div 63, 65 [3d Dept 1949]; Leone v Russo, 190 Misc 984, 987 [Sup Ct, Nassau County 1948], affd 275 App Div 674 [2d Dept 1949]; Sabre Realty Mgt. v Vitale, 94 Misc 2d 1035, 1037 [Civ Ct, Kings County 1978].)
The marine rule should not be applied herein as it does not deal with a commercial building but a residential building with protected tenancies. In all the cases supporting the marine rule, the premises have been commercial, not residential. While the marine rule focuses primarily on economic gain, it gives no consideration to protected residential tenancies or the fact that families’ homes are involved. The Multiple Dwelling Law, the Housing Maintenance Code and the Rent Stabilization Law are applicable here. "Even if the marine rule could *508 be invoked and it is the opinion of this court that it would be against the public policy of this State to do so where residential units are involved, thereby depriving citizens of their rights in their homes, based upon a sterile [mathematical] formula, it would fall here.” (Fernandez v Tsoumpas Bros. Co., 126 Misc 2d 430, 433-434 [Civ Ct, NY County 1984].) In Fernandez, the subject premises was a residential building which had been damaged by a fire and contained either rent-controlled or rent-stabilized tenants. Likewise, in Eyedent v Vickers Mgt. (134 Misc 2d 481 [Civ Ct, NY County 1986], revd 138 Misc 2d 459 [App Term, 1st Dept 1988], revd 150 AD2d 202 [1st Dept 1989]), the court held that the marine rule should not be applied mechanically. The legislative purpose of the rent regulations made the application of the marine rule to residential real estate contrary to public policy. "Whatever may be said for the viability of the rule in a commercial setting it should not be applied at all where, as here, there are protected tenancies.” (Eyedent v Vickers Mgt., 134 Misc 2d, supra, at 484-485.)
"The Court of Appeals held in Park W. Mgt. Co. v Mitchell (47 NY2d 316, 327 [1979], cert denied 444 US 992 [1980]) that a landlord of a multiple dwelling has the obligation to maintain residential premises 'fit for human occupation * * * throughout the lease term’. Furthermore, this obligation of a landlord to keep residential property in good repair is imposed by statute (Multiple Dwelling Law § 78; Administrative Code of City of New York § 27-2005).” (Eyedent v Vickers Mgt., 150 AD2d 202, 204 [1st Dept 1989], supra.) The statutes, ordinances, rules and regulations of the State and City of New York all require continued maintenance of existing residential premises in safe and habitable condition. This obligation is normally placed on the owner. Multiple Dwelling Law § 78 provides, in pertinent part: "1. Every multiple dwelling, including its roof or roofs, and every part thereof and the lot upon which it is situated, shall be kept in good repair. The owner shall be responsible for compliance with the provisions of this section”. The Housing Maintenance Code requires, at Administrative Code § 27-2005:
"a. The owner of a multiple dwelling shall keep the premises in good repair.
"b. The owner of a multiple dwelling, in addition to the duty imposed upon such owner by subdivision a of this section, shall be responsible for compliance with the requirements of this code, except insofar as responsibility for compliance is imposed upon the tenant alone”.
Thus, the statutes and regulations of the City and State do not *509 allow an owner to simply give up on a residential building, without seeking prior permission to do so from the appropriate governmental agency, simply because the owner feels that continued repair and maintenance would be against its economic interest. No exception is made in these statutes for economic infeasibility, nor is any statutory defense given to the owner of a building so badly damaged by fire that the cost of restoration would exceed half the value of the building just before the fire. Thus, application of the marine rule would directly violate the public policy of this State as expressed in the statutory law, rules and regulations.
Even if the court were to apply the marine rule in the present case, factors other than the application of the 50% valuation should be considered. The matter does not turn solely on the wishes of the owner or his apparent financial interest. The interests of both parties need to be considered. "The situation of the plaintiff who took this lease as a part of the consideration or price for which it sold the building, and its interest in the leasehold must be taken into account in determining whether it was reasonably practical to repair.” (General Outdoor Adv. Co. v Wilson, 276 App Div 63, 66 [3d Dept 1949], supra.) Even if the marine rule were to be applied herein by the court in contravention to established precedent, factors such as the petitioners’ interest and investment should be considered. In the present case there are 42 rent-regulated units and 18 owner-occupied units. Their rights and interests in the building must be carefully factored in.
In conclusion, the marine rule is not applicable to a residential building, especially in this case where there are protected tenancies and tenancies involving substantial financial investment (cooperative apartments). It does not seem to this court that any test based on simply the market value of the premises immediately before the fire (or after possible restoration) should be mechanically applied here. The court is dealing with strong public policy, as expressed in the statutory and decisional law of New York, requiring owners and landlords to maintain their buildings in safe and habitable condition.
The Administrative Code defines the term "owner” to include: "the owner or owners of the freehold of the premises or lesser estate therein, a mortgagee or vendee in possession, assignee of rents, receiver, executor, trustee, lessee, agent, or any other person, firm or corporation, directly or indirectly in control of a dwelling” (Administrative Code § 27-2004 [45] [emphasis added]). The proof at trial shows that respondent 610 W. 142 *510 Owners Corp. is the owner of the freehold; this is undisputed. It is also incontrovertible from all the testimony and exhibits presented at the trial that respondent Leon Scharf has been the person directly in control of the premises. He is clearly the one who made all the important decisions. It is equally evident that Leon Scharf’s son, respondent Morris Scharf, was responsible for the day-to-day management functions of the building under the direction of his father. Thus, both Leon Scharf and Morris Scharf come within the description, "agent, or any other person, firm or corporation, directly or indirectly in control of a dwelling”. (Administrative Code § 27-2004 [45].) Therefore, they are both appropriate respondents in this proceeding under CCA 110 (a) (4), and should, as well as the 610 W. 142 Owners Corp., be responsible for any repair or restoration orders entered herein.
Economic infeasibility, if it is available at all as a defense to respondents, is concededly an affirmative defense. Thus, the burden of proof is upon respondents in this regard. Yet, respondents presented no proof whatever of the cost to the owners in the event the building is not restored. Thus the court is provided with no basis for comparison between the cost of restoration and the cost of not doing so. Certainly, the owner can’t claim that it will simply do nothing and abandon the property. Such an act would be entirely unlawful and against the public policy of the State and City. (See, e.g., Multiple Dwelling Law § 78; Administrative Code § 27-2005.) Thus, if the building is not restored, it would have to be demolished or something would have to be done to the premises to put it in compliance with the applicable statutes. Similarly, the rent-stabilized tenants and the proprietary lessees, who subscribed to a cooperative offering plan in which the individual respondents are the sponsors, have rights which cannot merely be ignored. The fact that a vacate order was issued by the City does not terminate the petitioners’ tenancies. (Eyedent v Vickers Mgt., 150 AD2d 202, 204 [1st Dept 1989], supra.) As stated by the Court, "[e]vidence that such vacate orders are not intended to terminate tenancies is found in Administrative Code § 27-2140 (c) (1), which states that such vacate 'order shall require that the owner correct the conditions which render the dwelling or part thereof unfit for human habitation’ ”. (Eyedent v Vickers Mgt., supra, at 204.) Indeed, respondents are currently in violation of the vacate order by virtue of not correcting the conditions which render the building uninhabitable.
*511 No proof was presented at the trial of what the demolition cost would be. No evidence was given regarding what, if any, relocation costs would be incurred on behalf of the rent-stabilized tenants. Nothing whatever was presented regarding the cost of possible liability of the cooperative and the individual respondents to the tenant shareholders for the destruction of their proprietary leaseholds if the building is not restored. Thus the court cannot determine, from the proof presented, what the difference would be between the cost of restoring the building and the cost to respondents of not doing so, while remaining in compliance with all their obligations to the State and City of New York, and to the individual petitioners. Yet it is the economic infeasibility of this very figure, not simply the difference between the cost of restoring the building and of doing nothing whatsoever, which respondents must prove, if they wish to succeed in this defense. Respondents, who have the burden of proof, cannot expect the court to speculate in this regard. It has been proven that the market value of the building, once restored, would be less than the total cost of repairs. Respondents have entirely failed to show the market value will not equal the difference between the cost of restoration and the cost of demolishing the building along with all the other expenses ancillary to the cost of demolition, if the landlords comply with all their legal obligations. In addition, there is no showing that the building, once again serving as residential housing, will be unable to generate sufficient income to recover the difference between these two costs within a reasonable amount of time. Thus, even assuming the affirmative defense of economic infeasibility is available to respondents under the circumstances herein, they have failed to prove it.
In Eyedent v Vickers Mgt. (150 AD2d 202, 205 [1st Dept 1989], supra), the Court held that where the economic hardship faced by landlords in making the required repairs was self-inflicted, the defense of economic infeasibility was unavailable to them. (Accord, Department of Hous. Preservation & Dev. v Mill Riv. Realty, 169 AD2d 665 [1st Dept 1991], affd 82 NY2d 794 [1993].) Here, unlike respondents in Eyedent, the owners did not ignore their obligation to keep the premises in habitable condition before the fire. However, they did fail to keep the building adequately insured. Although there is no statutory obligation for a landlord to insure a building against casualties such as fire, the offering plan stated that at least $3,000,000 in replacement cost insurance would be carried. This obligation under the offering plan would normally last only a year (13 NYCRR *512 18.3 [g] [3] [viii]). However, it is still applicable to respondents herein because of the large number of unsold cooperative shares that currently exist. Holders of unsold shares must amend the offering plan to include current and accurate information regarding insurance coverage until such time that the shares are sold to bona fide purchasers. (13 NYCRR 18.3 [w] [11].) The offering plan for conversion of the premises to cooperative ownership stated that $3,000,000 insurance would be carried for 100% of replacement cost. Respondent Leon Scharf, acting as president of the Board of Directors, reduced this insurance to a $2,000,000, 80% coinsurance policy, yet the plan still contains the original figure. Thus, the original insurance obligation of $3,000,000 remains in effect because the individual respondents are original sponsors holding a significant number of unsold cooperative shares, who have failed to amend the offering plan to reflect the reduction in insurance to $2,000,000 in coverage. Because of an underinsurance penalty imposed by the current carrier, only $1,600,000 is available from the insurance company for restoration of the building. This reduction in insurance coverage was made in September 1991, in the words of Mr. Scharf, "in order to save money”. No serious consideration was given to the issue of whether this reduced insurance would be sufficient to cover actual replacement cost of the building, as represented in the offering plan, in the event of a tragic fire such as the one that occurred here. Yet such a risk is easily foreseeable to the owner of any real property, particularly a 60-unit residential rental property such as the one here in question. Indeed, the credible evidence shows that before Mr. Scharf purchased the insurance for a reduced amount, the Aetna Casualty and Surety Company advised Mr. Scharf through his agent that the building had insufficient coverage at $3,000,000. Aetna then canceled the original policy, yet Mr. Scharf subsequently purchased insurance at an even lower amount of coverage. The evidence also showed that the other members of the cooperative board and the shareholders were not given any serious input into the significant reduction in insurance coverage. Instead the decision, in which they were given no part, was presented to them as an established fact which they were simply expected to accept without question. Thus, although there is normally no statutory duty to insure residential premises against loss as a result of fire, respondents are in violation of 13 NYCRR 18.3 (w) (11). General Business Law article 23-A, which governs cooperative conversions, "is remedial in nature and should be liberally *513 construed * * * [T]he most rigid standards of fair dealing and good faith toward tenants are to be imposed on promoters”. (People v Lexington 61st Assocs., 38 NY2d 588, 595 [1976].)
Respondents also breached a duty to those of the petitioners who are proprietary lessees. The reduction in insurance coverage violated the contractual obligation between the Scharfs as sponsors of the offering plan and the petitioner proprietary lessees as subscribers. The sponsors made a representation in the offering plan that the building would have $3,000,000 all risk insurance for 100% of replacement cost. (The subscription agreement [para 14] states, "[t]he entire agreement between the parties hereto is set forth herein and in the Plan. The only representations made to me are those contained herein and in the Plan. I have not relied upon any representations, statements or warranties, written or oral, as to any matter or estimate, that are not set forth herein and in the Plan.” The offering plan is so much a part of the contract between the parties that (para 15) the subscription agreement provides, "[c]onflicts between this Subscription Agreement and the Plan shall be resolved in favor of the Plan.” Thus, there is an unambiguous and enforceable representation by the individual respondents herein as sponsors of the offering plan that the $3,000,000 insurance coverage described in the plan would continue, at least until the plan was amended or the sponsors were no longer holders of a majority of the shares as unsold shares. As explained above, no amendment was made to the plan and the Scharfs are still holders of the unsold two thirds of the shares. The reduction in insurance coverage executed by Leon Scharf, without any meaningful consultation with the other shareholders and without giving them any effective opportunity to express their wishes in the matter, constitutes a direct breach of the representations he made in the offering plan and the subscription agreements. Thus, the owners not only breached a statutory duty to the petitioners and the public, they breached a direct contractual duty to petitioners. There is no question that respondents were in privity with petitioners. For these reasons, the defense of economic infeasibility, even if it had been properly proven, should not be available to respondents, who caused the economic difficulty by their own actions. (Department of Hous. Preservation & Dev. v Mill Riv. Realty, 169 AD2d 665, affd 82 NY2d 794, supra; Eyedent v Vickers Mgt., 150 AD2d 202, supra.)
 The owners took the risk of knowingly underinsuring the building, and now seek to avoid the reasonably foreseeable *514 consequences of their actions. Under such circumstances, they cannot be heard to claim that requiring them to restore the building to a state fit for human habitation, in compliance with the vacate order, would work an unconstitutional taking because it would cause them to suffer financial loss. They brought the loss upon themselves by violating the insurance requirement in the cooperative offering plan without bothering to amend that plan. The United States Constitution does not protect parties from economic loss caused by their own bad or foolish business decisions. (United States v Locke, 471 US 84 [1985].) This is a proceeding in which petitioners seek equitable relief under CCA 110 (a) (4). Economic infeasibility is in effect an equitable defense which seeks to avoid the clearly stated provisions of all the applicable statutes based upon economic hardship. In such circumstances, respondents must come to the court with clean hands. Because of their actions in under-insuring the building in violation of the offering plan, without meaningfully consulting the other cooperative shareholders,[4] respondents do not have the clean hands necessary to assert this equitable defense. Respondents made a written representation in fhe offering plan, thus incorporated into the subscription agreements as well, regarding insurance coverage. They should be estopped from now asserting a defense based on the economic hardship they brought upon themselves and all the other shareholders, by virtue of their having disregarded their own representation. For this reason as well, respondents’ defense of economic infeasibility must be, and is, denied.
Respondents also argue that Seawall Assocs. v City of New York (74 NY2d 92 [1989], cert denied 493 US 976 [1989]) precludes this court from ordering them to restore the building. This claim is incorrect. In Seawall, the Court held that Local Laws 1987, No. 9 of the City of New York was an unconstitutional taking of owners’ possessory interests in their properties, including their rights to exclude others. (Seawall Assocs. v City of New York, supra, at 102.) The statute forced the owners to do business with people (potential SRO tenants) with whom they had no prior dealings. Here, respondents already have leases with and obligations to all of petitioners, and are currently in breach of the duties imposed thereby. Seawall *515 Assocs. v City of New York (74 NY2d 92, supra) does not hold that it would be unconstitutional for an owner to be required to restore, or even reconstruct, a building to be occupied by tenants with whom it already has privity, and who resided in the building before it was severely damaged by fire. Therefore, Seawall is entirely inapplicable to this proceeding.
The owners also claim that Manocherian v Lenox Hill Hosp. (84 NY2d 385 [1994], cert denied — US —, 115 S Ct 1961 [1995]) prevents an order requiring an owner to restore the subject premises to a habitable state. However, Manocherian deals with chapter 940 of the Laws of 1984, which bestowed "a State-enacted indirect gift to a preferred supplicant, the nonoccupying prime tenant, underwritten by the improperly burdened property owners.” (Manocherian v Lenox Hill Hosp., supra, at 397.) No matter how many successive employees of the hospital occupied various apartments in plaintiffs property as subtenants of the hospital, the owner was required to continually bear this burden with no foreseeable end. The statute effectively deprived the owners of their right of reversion, by granting Lenox Hill Hospital what were in effect tenancies in perpetuity that could never be terminated for so long as the hospital existed. The Court described such benefit to the hospital as "special privileges [which] last for as long as its unilaterally controlled corporate existence.” (Manocherian v Lenox Hill Hosp., supra, at 391.) That, of course, deprived the owners of an important property right. The public purpose of the Rent Stabilization Law and the Emergency Tenant Protection Act, which seek to ameliorate the emergency housing shortage, were not served by allowing a private institution, albeit eleemosynary, to hold rent-stabilized apartments in perpetuity. Applying the housing statutes and regulations which require all owners of residential apartment buildings to maintain them in habitable condition, to respondents herein, does not give any particular class of persons or entities special privileges or burdens. Undoubtedly, Multiple Dwelling Law § 78 and Administrative Code § 27-2005 benefit all the citizens of the City. The fact that these statutes and the other housing laws may be applied to particular persons who are involved in a situation clearly covered by the statutes does not effectuate an unconstitutional taking. All statutes are obviously written to apply to individuals who are necessarily affected by their provisions. Here, the owners are not being forced to keep any tenants in perpetuity. Their right of reversion remains the same as it always was under the Rent Stabilization Law regard *516 ing the rent-stabilized tenants and under the proprietary leases of the tenants who subscribed to the cooperative offering plan. Thus, there is no pertinent analogy between the facts of this proceeding and those of Manocherian v Lenox Hill Hosp. (84 NY2d 385, supra).
For all of the above reasons, this court finds that to apply the Multiple Dwelling Law and the Administrative Code, as written, to respondents, does not work an unconstitutional taking under the Fifth and Fourteenth Amendments to the United States Constitution. Further, as already explained, the court finds that respondents have failed to prove the economic infeasibility of restoring the building versus the cost of not doing so. Finally, as also explained above, respondents cannot assert the equitable defense of economic infeasibility because they brought the economic hardship upon themselves by the heedlessness of their actions in underinsuring the subject building, in violation of the offering plan. Respondents took a somewhat foolhardy risk; they cannot now avoid its cost.
Accordingly, respondents 610 W. 142 Owners Corp., Leon Scharf and Morris Scharf are directed to restore the subject building to safe and habitable condition within eight months after service of this order together with notice of entry.

. The court notes that the mortgagee and DHPD argued no position at the trial or summations and submitted no posttrial memoranda when called for by the court. Hence, they are essentially in default for all practical purposes, apparently by their own choosing.

. Each side complains bitterly about their adversary’s playing semantic games with the use of the word "reconstruct” rather than "repair”, and vice versa. The court has no intention of allowing its decision in this proceeding to turn on semantics, and shall try to use the term "restoration” wherever possible in hopes that this will not offend the linguistic sensibilities of any of the parties. However, to avoid more than the ordinary amount of tedious repetition, the court will on occasion indulge in the use of "repair” or "reconstruct”.

. Unlike Oakland, California, as explained by the late Gertrude Stein: "There is no there there.” (Stein, Everybody’s Autobiography, at 289 [1973].)

. Considering the importance of this decision to all the residents of the building, the testimony clearly showed that no serious eifort was made by the Scharfs to contact the other directors or shareholders in advance of the drastic reduction in the amount of insurance, or to discuss it with them before instituting the serious change in everyone’s risk.