OPINION OF THE COURT
Per Curiam.
Orders entered September 26, 1995 and October 27, 1995 affirmed, with $10 costs.
This Housing Part proceeding concerns a six-story, 60-unit cooperative apartment building on West 142nd Street in Manhattan (the Premises) which was severely damaged and rendered uninhabitable by a fire on February 7, 1994. Respondent 610 West 142nd Owners Corp. (the Corporation) owns the Premises. Petitioners, who are both tenants and proprietary lessee shareholders who occupied the Premises, brought this proceeding under Administrative Code of the City of New York, title 27, chapter 2 (the Housing Maintenance Code or HMC) and CCA 110 to compel restoration of the Premises to habitable condition. Appellants Leon and Morris Scharf, along with three other members of their family, sponsored the cooperative conversion in 1990 and hold approximately two thirds of the Corporation shares. Morris Scharf has been the registered managing agent for the Premises, is a partner in the Premises’ management company and is the secretary of the Corporation. Leon Scharf, Morris’ father, is the Corporation president and "the person directly in control of the [Premises.” (Bernard v Scharf, 167 Misc 2d 502, 510.)
The Corporation’s offering plan requires that the Premises be insured for full replacement cost, which was valued at $3 million when the Corporation was formed in 1990. In September 1991, however, Leon Scharf, acting as president of the Board of Directors, reduced the Premises’ insurance by replacing the original $3 million policy with a $2 million, 80% coinsurance policy. He did not report the insurance reduction to the Corporation’s Board of Directors until December 1991.
At the time of the fire, 18 apartments had been purchased by shareholders, 26 were rented as rent-stabilized or controlled apartments and the remainder were rented at unregulated market rates. On February 8, 1994, the day after the fire, the Department of Buildings (DOB) issued a vacate order and the Premises were evacuated. Thereafter, neither the Corporation nor the appellants took any action to demolish or restore the Premises; from the date of the fire to approximately late November 1994, the Premises were left unsealed and unsecured *913 from damage due to exposure to the elements and vandalism. On or about August 16, 1994, the instant proceeding was commenced. On Septembér 23, 1994, the Corporation filed for reorganization under chapter 11 of the 1978 Bankruptcy Code (11 USC § 1101 et seq.), and on or after November 23, the DOB seáled the premises.
In the order appealed from, entered on September 25, 1995, the court after trial directed appellants as well as the Corporation to restore the Premises "to safe and habitable condition”. The court also found that the Scharfs were "owners” under the HMC and personally responsible for making the necessary expenditures for repairs. The bankrupt Corporation has not appealed from the subject order. On their appeal, appellants Scharf contend that they cannot be ordered to restore the Premises to habitability because to do so would be economically infeasible. They take issue with the lower court’s determination that the defense of economic infeasibility is unavailable to appellants because: (1) they presented no proof of the cost to them if the Premises is not restored, with respect to demolition charges, relocation costs for rent-stabilized tenants and liabilities to the tenant shareholders; and (2) appellants are estopped from asserting the infeasibility defense because they brought it on themselves through their deliberate underinsurance of the Premises. Joined by amicus curiae Pacific Legal Foundation, appellants also claim that the lower court’s order to restore the Premises is an uncompensated "taking” that violates their due process rights under the 5th and 14th Amendments to the United States Constitution. Finally, appellants argue that the HMC is inapplicable to this proceeding because the fire-damaged Premises does not constitute "salvageable” housing within the meaning of the statute.
Appellants also appeal the denial, by order entered October 27,1995, of their motion to renew on the ground that the Bankruptcy Court’s appointment of a trustee for the Corporation relieves appellants from responsibility under the HMC.
We affirm both orders.
Statutory Framework; Applicability of the HMC
The Housing Part of the Civil Court of the City of New York is vested with original jurisdiction of "actions and proceedings involving the enforcement of state and local laws for the establishment and maintenance of housing standards, including * * * the multiple dwelling law and the [HMC]”. (CCA 110 [a].) The statute further provides that "[r]egardless of the relief *914 originally sought by a party the court may recommend or employ any remedy, program, procedure or sanction authorized by law for the enforcement of housing standards, if it believes they will be more effective to accomplish compliance or to protect and promote the public interest”. (CCA 110 [c].)
The HMC, applicable to all residential dwellings, provides for "the sound enforcement of minimum housing standards” in order to
"preserve decent housing * * *
"prevent adequate or salvageable housing from deteriorating to a point where it can no longer be reclaimed; and * * *
"to bring about the basic decencies and minimal standards of healthful living in already deteriorated [buildings], which, although no longer salvageable, must serve as habitation until they can be replaced”. (Administrative Code § 27-2002.)
The HMC requires that "[t]he owner of a multiple dwelling shall keep the premises in good repair * * * and be responsible for compliance with the requirements of this code”. (Administrative Code § 27-2005 [a], [c].) An "owner” is defined as, inter alia, the owner of the fee and "any other person, firm or corporation, directly and indirectly in control of a dwelling”. (Administrative Code § 27-2004 [45].) Injunctive relief is available against owners requiring them to abate or correct HMC violations. (Administrative Code § 2121.) The HMC should be construed in order to advance its underlying legislative intent: "to protect and preserve existing housing”. (Fernandez v Tsoumpas Bros., 126 Misc 2d 430, 433.) Accordingly, the courts have the power under the HMC to order repairs to buildings whose HMC violations arise from fire damage. (Bing Chung Chan v 60 Eldridge Corp., 129 Misc 2d 787.)
Inasmuch as a fundamental purpose of the HMC is to correct any condition leading to the deterioration of salvageable housing, the statute applies here. It is implicit in the trial court’s findings of fact that the Premises is salvageable, although at considerable cost. After hearing the testimony of several expert witnesses during a full trial, and after a personal inspection of the Premises, the court found that: "The floors and walls of the first five stories are solid. The fifth story has severe damage, but also has solid walls and floors; the ceiling, however, is almost completely destroyed. The sixth [top] story is effectively gone for all practical purposes, except for the exterior walls, which have also sustained visible damage around the parapets. The roof is a total loss. However, most of *915 the building exists, although in very poor condition.” (Bernard v Scharf, supra, at 506.)
Economic Infeasibility Defense
Economic infeasibility is an affirmative, equitable defense for which the proponent has the burden of proof. (Buchanan v Toa Constr. Corp., NYLJ, May 31, 1989, at 21, col 1 [App Term, 1st Dept].) We are persuaded that, at trial, appellants failed to prove that restoring the Premises was economically infeasible for the reasons set forth by Judge Wendt (Bernard v Scharf, supra, 167 Misc 2d, at 510-511). We summarize here the lower court’s well-reasoned analysis:
The court found that it was "evident from the expert testimony offered by both sides the cost of repairs would most likely exceed the market value of the restored [Premises]”. (Supra, at 506.) Appellants presented no proof, however, of the costs they would incur if the building is not restored. Such proof is necessary for the sake of comparison. If the Premises is not restored, it will have to be demolished or otherwise put in compliance with the applicable statutes; appellants would bear the cost for this. Likewise, appellants would bear the cost for relocating displaced rent-stabilized tenants. Possible liabilities of the Corporation and the appellants to the tenant shareholders for the destruction of their proprietary leaseholds must also be considered. The court concluded that appellants "have entirely failed to show the market value [of the restored Premises] will not equal the difference between the cost of restoration and the cost of demolishing the [Premises] along with all the other expenses ancillary to the cost of demolition, if the landlords comply with all their legal obligations.” (Supra, at 511.) The court further noted that no proof was presented that, once restored, the Premises would not generate enough income to recover the cost discrepancy in a reasonable time.
The trial court also properly found the "marine rule”, which appellants invoke as a measure of the Premises’ salvage-ability, inapplicable. The marine rule was developed in marine insurance cases with respect to ships, but has been invoked in cases concerning commercial buildings. (See, e.g., Corbett v Spring Garden Ins. Co., 155 NY 389.) The rule states that if the cost of restoration exceeds one half the value of the building before the damage, then there is deemed a total destruction that does not require repair. The trial court held that the marine rule is inapplicable to residential buildings, "especially in this case where there are protected tenancies and tenancies *916 involving substantial financial investment (cooperative apartments)”. (Bernard v Scharf supra,, at 509.) To mechanically apply the marine rule to residential property would thwart the strong public policy that housing be maintained in safe and habitable condition.
We also agree with the trial court that appellants are estopped from asserting an economic infeasibility defense by virtue of their deliberate underinsurance of the Premises. If the Premises had been insured for its full replacement cost at the time of the fire, appellants would not have their present difficulties. (See, Bing Chung Chan v 60 Eldridge Corp., supra, 129 Misc 2d, at 791 [An owner’s "unilateral decision on the amount of insurance it chose to carry cannot determine (the economic feasibility) of repairs. Any other conclusion encourages underinsurance.”].) Appellants’ alleged economic hardship is entirely self-created: the lower court found after trial that "the other members of the cooperative board and the shareholders were not given any serious input into the significant reduction in insurance coverage” by appellant Leon Scharf, but were instead presented with a fait accompli. (Bernard v Scharf, supra, 167 Misc 2d, at 512.) Appellants’ underinsurance of the Premises amounts to a bad business decision for whose consequences they are responsible. (See, Department of Hous. Preservation & Dev. v Mill Riv. Realty, 169 AD2d 665, 669, affd 82 NY2d 794 [economic infeasibility defense unavailable where hardship was "self-inflicted”]; accord, Eyedent v Vickers Mgh, 150 AD2d 202, 205.)
The economic infeasibility defense is also unavailable to appellants because their underinsurance of the Premises breached both appellants’ statutory duty and their contractual obligations to the petitioner proprietary lessees. The Corporation’s offering plan provided that the sponsors would carry at least $3 million in replacement cost insurance for the Premises. Appellants never amended the offering plan to disclose the reduced coverage, in violation of 13 NYCRR 18.3 (w) (11), which provides that the holder of unsold cooperative shares "shall amend the [offering] plan to provide current and accurate information about the offering * * * until the shares held as unsold shares have been sold to bona fide purchasers.” Inasmuch as appellants and the other sponsors still held two thirds of the shares and controlled the Corporation, appellants’ failure to amend the offering plan to disclose the underinsurance breached a duty both to the proprietary lessees and the public at large.
*917 The Order to Restore Does Not Effect an Uncompensated. Taking
The trial court’s order to repair does not constitute an unconstitutional physical or regulatory taking. The statutory requirement that a landlord keep residential property in good repair is a legitimate exercise of the police power (see, Loretto v Teleprompter Manhanttan CATV Corp., 458 US 419, 440). Appellants purchased the Premises and operated it as residential property subject to the HMC and other housing laws. Accordingly, appellants cannot claim that the order to repair constitutes a physical taking; as the Appellate Division, First Department has noted, "the Court of Appeals has drawn a sharp distinction with respect to the Takings Clause [of the Constitution] between regulation that protects the current tenant, which is generally permissible, and regulation that subjects the property to a use never intended, i.e., a landlord-tenant relationship, such as to constitute a physical taking.” (Dawson v Higgins, 197 AD2d 127, 135.) The trial court’s order to restore the Premises, which protects, existing tenancies and leaseholds, falls into the former category.
Nor does the trial court’s order constitute a regulatory taking. Government regulation may be deemed a regulatory taking "(1) if it denies an owner economically viable use of his property, or (2) if it does not substantially advance legitimate State interests.” (Seawall Assocs. v City of New York, 74 NY2d 92, 107.) As previously noted, appellants made no showing at trial that the Premises, once restored, will not generate sufficient income to offset the restoration expenses over time. Moreover, there can be no question that the State has a legitimate interest in keeping residential properties habitable, even after fire damage, and that the HMC and other statutes and regulations in question advance these interests.
Appellants are Liable as "Owners”
The record abundantly supports the Civil Court’s finding that appellants are "owners” under the HMC, inasmuch as they are "directly or indirectly in control of the premises.” Along with other family members under their control, appellants were the majority shareholders of the Corporation’s shares, controlled the Board of Directors and made and implemented all policy decisions, including the relinquishment of full replacement cost casualty insurance in 1991, thus causing the Premises to be underinsured at the time of the fire. They also acted as landlords to the nonshareholder tenants. *918 They caused the Corporation to seek the protection of the Bankruptcy Court. Clearly, the Corporation was the alter ego of these appellants. It is the intent of the HMC to pierce the corporate veil and hold true "owners” rather than the holders of title responsible for violations (Housing & Dev. Admin, v Johan Realty Co., 93 Misc 2d 698).
Appellants’ claim that they cannot be held liable after their replacement at the helm of the bankrupt corporate debtor in possession by a trustee lacks merit. The Scharf family owns the majority of the Corporation’s shares, and the evidence adduced at trial indicates that appellants are still de facto in control of it. Accordingly, as "owners” of the Premises under the HMC, appellants are obligated to undertake and finance the restoration of the Premises under the lower court’s order of September 26, 1995.