McCooe, J. P.
(dissenting). I respectfully dissent.
I disagree with the finding that the owners have not established economic infeasibility. The trial court committed three errors. First, it concluded that the cost of repairs exceeded the market value of the property after repairs but made no findings of fact as to either the dollar and cents cost of repairs or its market value. Second, it held that the owners were required to prove the cost of not restoring the building but advanced no legal basis or appraisal methodology to support its position. Third, it found that the failure of the owners to carry a higher limit insurance policy rendered it liable. Insurance is not relevant to the issue of economic infeasibility. The majority opinion has adopted the trial court’s decision.
Neither the trial court nor the majority made findings of fact as to the cost of repairs and the market value of the property after the repairs. The trial court decision refers to figures testified to by the experts, the cost of repairs and the market value, but it does not state which figures it adopts for the purpose of drawing conclusions of law. Significantly it does state that "It has been proven that the market value of the building, once restored, would be less than the cost of repairs.” (Bernard v Scharf, 167 Misc 2d 502, 511.) Reference to " 'dollars and cents’ evidence” is necessary to appreciate the economic aspects of this case, (de St. Aubin v Flacke, 68 NY2d 66, 77.)
The building was purchased for $800,000 and comparable property on that street was shown to be in the same range. A *919 fire occurred with extensive damage, the degree is in dispute. The tenants’ expert testified that repairs would cost approximately $2.5 million. The owners’ three experts’ figures for repair were $4.3 million, $4.8 million and $4.7 million, respectively. These figures differ somewhat from the trial court decision but they are generally more favorable to the tenants and are in line with the Department of Housing Preservation and Development (HPD) figures. The experts who testified used the income and sales comparison methods of appraisal. The $4.7 million estimate was prepared by the appraiser for the insurance company insuring the loss. The tenants’ appraiser testified the building would have a market value of $2.25 million after repairs were completed. The owners’ two appraisers testified it would have a market value of $870,000 and $820,000. It is undisputed that five years before the fire, Aetna Insurance Company refused to renew the insurance coverage unless the policy was increased to $4.5 million, which they determined to be the replacement cost for the subject premises.
CPLR 4213 Ob) mandates that a trial court make findings of fact as to the essential elements of the case. Since it did not make findings of fact as to the issues of market value and the cost of repairs, this court does so based upon an independent examination of the record.
It is undisputed that five years prior to the fire, Aetna determined that the total replacement cost of the building was $4.5 million. The trial court by inference found that the damage exceeded 50% by its consideration of the "marine rule.” Therefore there can be no serious dispute that the replacement cost exceeded $2.25 million, since the tenants’ experts testified to $2.5 million. I accept the figure of the insurance adjuster who testified from a report he prepared for the insurer and not for trial purposes that the restoration cost would be in the $4.7 million range. The $4.7 million restoration figure testified to and the minimal differential between the $4.7 and $4.5 million total replacement figure reinforces the finding that the property is not reclaimable since almost totally destroyed. I find based upon the testimony that the market value after restoration would be in the $1 million range. Since the experts and the trial court all agree that the cost of repairs would exceed the market value after restoration, should we conclude that the property in its present condition has a minus market value? The present market value is a reflection of the extent of damage and the reclaimability of the property. Furthermore, since the replacement cost of the building is twice its market *920 value if the tenants’ valuation is accepted, five times its market value if the owners’ valuation is accepted, and five times comparable property, the totality of these facts and conclusions establish an economic infeasibility defense. Unlike Eyedent v Vickers Mgt. (150 AD2d 202), the owners have established an economic basis for their defense.
The trial court decision required the owners to establish the difference between the cost of restoring and not restoring the building, but gives no authority for such methodology. Appraisers for both sides testified in a lengthy trial as to the customary and accepted appraisal methodology of comparing repair costs to market value used in Eyedent v Vickers Mgt. (supra). HPD does not adopt the tenants’ argument on this point. Insofar as the trial court referred to demolition and relocation costs it may have been treating this case as if it was brought under housing agency guidelines by an owner to voluntarily withdraw a housing accommodation from the market where the owner is required to pay demolition and relocation fees. Clearly this is not a case of demolishing the building since neither side is seeking such relief. There is an obvious difference between a situation where an owner seeks to withdraw sound housing from the market and where housing is destroyed by fire not caused by the owner. In the former situation the owner must compensate the tenants, in the latter situation no compensation is required. In any event, it is obvious the costs of tearing down the building are minimal in comparison to the cost of restoration.
While the parties argue the issue of insurance limits we must first decide if insurance is even an issue. Is the financial ability or inability of the owners to do the renovation relevant in determining economic infeasibility? No, because it is a different issue. Economic infeasibility relates to the economic condition of the building and not of the owners. Factors such as the cost of restoration and market value determine economic feasibility. The owners’ ability to pay is not a factor in reaching that determination. (Bing Chung Chan v 60 Eldridge Corp., 129 Misc 2d 787, 791.) Whether the owners have a $5 million insurance policy or a $1.6 million policy, or are solvent or insolvent, the result should be the same.
Apart from the fact that insurance is not relevant to an economic feasibility defense, the insurance argument has no validity. There is no compulsory insurance coverage for property. The exception relied upon by the cooperative tenants applies only to the 18 shareholders. The owners were required to *921 budget $3 million fire insurance coverage for one year from the date of closing. (13 NYCRR 18.3 [g] [3] [viii].) The year had expired at the time of the fire. The legislating body set one year as the limit and we are asked to legislate by extending the period because a large number of unsold shares exist. Since they are still unsold, where is the harm to the 18 shareholders and furthermore there is no showing that they purchased after the one-year period expired. Accepting, arguendo, that the owner had continued the $3 million coverage, and that this proceeding was brought for the same relief, the owners could still argue that there is a $1.7 million shortfall between market value and the cost of restoration. The proprietary lease required the owners to repair fire damage to the proprietary lessees’ apartments or replace them. This provision clearly does not require the owners to restore if the building was completely destroyed or damaged to the extent herein. The remedy they may have, if any, for contractual monetary damages is not before this court.
While not necessary to a finding that the economic infeasibility defense has been established, I disagree with the majority insofar as it finds that a regulatory taking has not been effected by the Housing Maintenance Code as applied. The direction to restore the building at the cost required denies the owners an "economically viable use of his property.” (Seawall Assocs. v City of New York, 74 NY2d 92, 107.)
The brief by HPD requires comment to indicate why the arguments were considered but not accepted. Initially HPD states that "economic feasibility” is determined by the objective criteria in the rent regulations, citing Matter of New York Realty Corp. v Herman (11 AD2d 643). This was an article 78 proceeding reviewing a voluntary withdrawal from the housing market and the Court correctly found that the objective criteria in the regulations must be established. There are no regulations applicable here because this is not an agency proceeding to voluntarily withdraw the property from the market. Treating this case as if it was brought under some regulation, HPD disagrees with the appraisers for using subjective criteria rather than the objective criteria in the regulations. There are three general methods of valuation: summation, market data and capitalization or income producing. Using the objective criteria HPD has adopted the capitalization or projected income for the property seeking to establish economic feasibility. The objective criteria under the rent regulations only allows certain expenses in calculating costs. For *922 example, the cost of plastering is not allowed but sheet rock is. It appears that the economic test being used is whether the property can produce an 81/2% profit on the assessed valuation; not on the owners’ investment which would be almost $5 million. HPD is using assessed valuation and not market value as a criterion. The HPD methodology is neither applicable nor flexible enough to allow important factors such as comparable sales to be used in fixing valuation. Noticeably both the tenants and HPD advance different criteria but both under regulations which are inapplicable because this is not an agency proceeding and no statutory criteria are mandated. The housing regulation which most nearly resembles this proceeding provides for withdrawal from the housing market by the owner when the cost of repairs equals or exceeds the assessed value of the building. (Rent Stabilization Code [9 NYCRR] § 2524.5 [a] [1] [ii].) This standard does not favor the tenants since it uses assessed value and not market value. The Court of Appeals, in a different factual setting, has recently repeated that " 'the ultimate purpose of valuation * * * is to arrive at a fair and realistic value of the property involved.’ ” (Matter of Commerce Holding Corp. v Board of Assessors, 88 NY2d 724, 729.)
Summarizing this case, it is a question of economics, dollars and cents; the economics of restoration and not the economic health of the owners. A consideration of factors irrelevant to accepted appraisal methodology and insurance considerations confuses the issue of economic infeasibility. While sympathetic to the plight of the tenants, the reality is that the owners who didn’t cause the fire are being directed to expend almost $5 million ($21/2 million if the tenants’ figures are adopted) for the shell of a building when a comparable building on the same street sells in the $1 million range. This building will then be worth less than the cost of restoration.
The judgment should be reversed and the petition dismissed.
Freedman and Davis, JJ., concur; McCooe, J. P., dissents in a separate memorandum.